Petition of MOSER.

No. 227, Docket 21642.

United States Court of Appeals Second Circuit.

Argued May 5, 1950.

Decided June 14, 1950.

J. Vincent Keogh, United States Attorney, Brooklyn, N. Y., for the United States, appellant Edward S. Szukelewicz, Assistant United States Attorney, Brooklyn, N. Y., of counsel.

Morris E. Vogel, New York City, for appellee.

Before L. HAND, Chief Judge, and CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

Paul Moser, a native and citizen of Switzerland, was admitted to the United States on December 29, 1937 for permanent residence. He filed a declaration of intention to become a citizen in the District Court for the Southern District of New York on March 9, 1938 but on May 11, 1940 left voluntarily for Switzerland where he served as an officer in the Swiss Army until he was released from such duty in the fall of that year. He reentered the United States lawfully on October 11, 1940 as a non-quota immigrant returning to an unrelinquished domicile and has since resided in the City of New York. He married an American citizen on October 19, 1940 and has three children born in this country of that marriage.

On March 27, 1942 he filed a petition for naturalization alleging his marriage as above stated and claiming the exemptions accorded the spouses of citizens under the provisions of the Nationality Act of 1940. 8 U.S.C.A. § 710(b). This petition was dismissed in July 1945 for lack of prosecution.

Meanwhile he had registered in accordance with the provisions of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq., and on January 15, 1941 had filled out a questionnaire in which he requested either Class III or Class IV classification. He was classified in Class III-A. On January 11, 1944, however, his classification was changed to 1-A and on January 24, 1944 he applied to the Swiss Consulate in New York for assistance in obtaining deferment.

Article II of the Treaty of November 25, 1850 between the United States and Switzerland was in force at all times now material and provided, so far as here relevant, that "The citizens of one of the two countries, residing or established in the other, shall be free from personal military service; but they shall be liable to the pecuniary or material contributions which may be required, by way of compensation, from citizens of the country where they reside, who are exempt from the said service." 11 Stat. 587, 589.

He desired to take advantage of the above quoted provisions and the Swiss Legation at Washington was so informed. It had previously had some conversations with our Department of State in which it had put forth its view that Swiss nationals were entitled to deferment under the treaty without being thereby debarred from becoming American citizens in accordance with the provisions of the Selective Training and Service Act of 1940, 50 U.S.C.A. Appendix, § 303(a).

The above section of the statute contained a proviso "that any citizen or subject of a neutral country shall be relieved from * * * such liability in the manner prescribed by and in accordance with rules and regulations prescribed by the President, but any person who makes such application shall thereafter be debarred from becoming a citizen of the United States; * * *" And Section 316(a) of Title 50 U.S.C.A.Appendix, provided that, "except as provided in this Act, all laws and parts of laws in conflict with the provisions of this Act are hereby suspended to the extent of such conflict for the period in which this Act shall be in force."

As a result of the efforts of the government of Switzerland and of those made by other governments having similar treaty exemptions for their nationals, the form, known as DSS Form 301, which had been previously prescribed under the above statute in accordance with the Selective Service Regulations for execution by neutral aliens desiring to claim exemption from military service because of that status, was revised on March 16, 1943. The following clause, "I understand that the making of this application to be relieved from such liability will debar me from becoming a citizen of the United States" was deleted and the above quoted proviso in Sec. 3(a)

of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 303(a), was printed on the form though not in that portion of it above the applicant's signature.

On February 18, 1944, the Swiss Legation wrote the appellee that it had requested exemption for him under the treaty provisions and enclosed two copies of revised DSS Form 301, which he was instructed to "execute and file immediately with your Local Board." He was also told that this was necessary "to complete the exemption procedure" and that his Local Board "will then classify you in Class IV-C" which was the exempted classification he desired. This letter ended with the following paragraph: "Please note that, through filing of DSS Form 301, revised, you will not waive your right to apply for American citizenship papers. The final decision regarding your naturalization will remain solely with the competent Naturalization Courts."

The appellee executed both copies of the form, filed them with his Local Board, and was classified in Class IV-C. In doing so he represented that he was a non-declarant alien and the contention was made below that he fraudulently so stated, but that issue was resolved in his favor and is not now of moment.

This appeal is from an order admitting the appellee to citizenship and the overall question presented is whether under Article II of the treaty he was entitled to secure exemption from service in the armed forces of the United States without losing whatever rights he otherwise might have to become an American citizen.

■ While it is plain enough that the treaty did give the appellee immunity from such service, it is equally plain that it did not require him to take advantage of that immunity unless he so desired. To be sure the only express condition upon his acceptance of exemption was his liability for whatever pecuniary contributions were exacted from citizens in lieu of military service. This was evidently done to prevent discrimination against citizens and, we think, cannot be treated as an agreement that treaty nationals would be relieved from military service without affecting their status in other respects at all.

■ The treaty is silent on the subject of the acquisition of citizenship by nationals of either country residing in the other and so far as we are presently informed that subject was not considered when the treaty was made. See 3 Hackworth, Digest of International Law, pp. 598-612. In our opinion this treaty is without significance in respect to the right of either country to impose what conditions it sees fit upon the admission to citizenship of nationals of the other. It follows that Section 3(a) of the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A.Appendix, § 303(a), did not, by granting exemption from military service to all neutral aliens and at the same time debarring all such who applied for it from ever becoming an American citizen, contravene the treaty.

■ It would also seem plain that Congress intended to have the above statute apply to so-called "treaty aliens" like the appellee. There is nothing in the statute which limits the words "any citizen or subject of a neutral country" to citizens or subjects of neutral countries which had no treaty granting its citizens exemption from military service. Indeed the statute broadly provides that, "Except as otherwise provided in this Act, every other male person residing in the United States" shall, if within designated age limits, be liable for military training and service. Nor is there anything in the legislative history of the Act of 1940 to show that Congress did not intend the language it used to be as comprehensive as it appears to be.

■ The Swiss treaty did not undertake to provide how its nationals should claim exemption from military service or how it should be granted them. It had to be, and was, implemented by an Act of Congress. The forerunner of the Act of 1940 was the Selective Draft Law of 1917, 50 U.S.C.A. § 226 note. Ultimately that subjected to military service neutral aliens who had declared their intention to become citizens, but only upon their consent, and provided that they could dissent only by withdrawing their declarations, which

would debar them from ever becoming citizens. Originally, it was proposed to draft all male declarant aliens. A State Department official then suggested to Senator Hitchcock the exception of neutral aliens to comply with our "reciprocal naturalization" treaties. 56 Cong.Rec. 8415, 8418. No one apparently thought such a treaty as this would be affected by the law as passed. See 56 Cong.Rec. 8415-19, 8485. The present statute is unlike the 1917 Act in that it makes no distinction between declarant aliens and non-declarant aliens but that for present purposes is unimportant. A declaration of intention to become a citizen leaves an alien still an alien. Swiss citizens are no different from other aliens in this respect. See 3 Hackworth, Digest of International Law, pp. 192-94. So it seems abundantly clear that this statute was designed to treat alike aliens who were treaty-exempt from military service and those who were not. While in our opinion there was no violation of the treaty with Switzerland in doing so, even if there had been, the statute would control. Head Money Cases, (Edye v. Robertson) 112 U. S. 580, 5 S.Ct. 247, 28 L.Ed. 798; Pigeon River Improvement Slide & Boom Co. v. Charles W. Cox, 291 U.S. 138, 160, 54 S.Ct. 361, 78 L.Ed. 695; Ex parte Green, 2 Cir., 123 F.2d 862, cert. denied sub nom. Green v. McLaren, 316 U.S. 668, 62 S.Ct. 1035, 86 L.Ed. 1744.

The appellee, however, attempted to obtain his exemption not under the above statute but under the treaty and he did so because he wished to become an American citizen as well as to get exemption. Indeed, we should recognize that his desire to become an American citizen was paramount in his mind, for the court below has found, because it believed appellee when he so testified, that he would not have sought exemption had he known that it would deprive him of naturalization rights. So it is argued (1) that he did not waive any rights by applying for exemption and (2) that, even if he did, the United States is estopped from so asserting because of the revision of DSS Form 301 after negotiations with treaty countries as above stated.

We agree that the appellee waived no treaty rights when he applied for exemption. But we do not agree that on the facts here shown the government is estopped from enforcing the statute in this instance, assuming without deciding, that estoppel would, if shown, have such effect. So far as appears, all the government did was to relieve applicants for exemption from formally acknowledging in writing that they understood their application would prevent their becoming citizens and to leave the effect of their application to be decided as the law might require. That the Swiss Legation so understood is shown by the letter it sent the appellee advising him that filing the revised form would not be a waiver of his "right to apply for American citizenship papers. The final decision regarding your naturalization will remain solely with the competent Naturalization Courts." This assurance from the Swiss Legation was at most only its own interpretation of the effect of the appellee's application for exemption from military service on his right to apply for citizenship. Even if "right to apply for" can be stretched to be synonymous with "right to obtain" citizenship that would not bind this government. And at the least it was a caveat that informed the appellee that in the end his right to citizenship would be determined by the proper court.

It should be noticed that the claimed estoppel is not based, so far as appears, upon any assurance given by an authorized representative of this government that Form 301, revised, was not an application for exemption from military service in the manner prescribed by the statute, as indeed it was. Nor does the appellant now claim that he did not know it was such a form which he signed with intent thereby to obtain exemption. That he did not fully comprehend the legal consequences of his act, through no fault of this government, does not entitle him to any relief from the disability which the statute has made the result of his exemption. This does seem, however, to be an appealing case for legislative action.

Judgment reversed and petition dismissed.