Jose Tiania TEJEDA, Petitioner,

v.

UNITED STATES IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 18999.

United States Court of Appeals
Ninth Circuit.

May 19, 1965.

William C. Wunsch, Faulkner, Sheehan & Wiseman, Norman Stiller, San Francisco, Cal., for petitioner.

Cecil F. Poole, U. S. Atty., Charles Elmer Collett, Asst. U. S. Atty., San Francisco, Cal., for respondent.

Before POPE and BARNES, Circuit Judges, and THOMPSON, District Judge.

BARNES, Circuit Judge:

This is a petition to review a final order of deportation. Jurisdiction lies with this court under 8 U.S.C. § 1105a and 5 U.S.C. §§ 1031–1042; Foti v. Immigration and Naturalization Serv., 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 286 (1963).

The events leading to this order of deportation have been developed in the proceedings conducted by the Special Inquiry Office and the Board of Immigration Appeals. Petitioner is a national of the Philippine Islands. On March 10, 1926, he arrived lawfully in the United States and undertook permanent residence. He continually resided thereafter in the United States until June 13, 1946, when he departed for the Philippines.

Prior to his departure, petitioner had obtained a one-year reentry permit which by its terms was expressly valid until April 10, 1947.

Petitioner arrived in the Philippine Islands on August 4, 1946 at the port of Manila. His testimony indicates that he remained in Manila for about one month, and then proceeded to his home town of Makati. He stated at the deportation proceedings that his intention was "to see his folks, get married, and return to the United States." He did in fact marry in October 1946, but found it impossible to travel when his wife became pregnant. The child was born on July 31, 1947, some time after petitioner's reentry permit had expired. Late in 1947 or early in 1948, petitioner alleges he went to the American Consul in Manila. He showed the Consul his expired reentry permit as well as a United States Seaman passport which had been issued to him on August 11, 1943. The Order of the Board of Immigration Appeals indicates that "[t]he Consul marked his passport 'Cancelled' and told him his reentry permit had elapsed and there was nothing he could do for him." (Tr. 3.) Petitioner returned to his Makati rice farm, and took no other steps to obtain reentry to the United States until 1952, when he unsuccessfully registered in Manila for entry under the quota system.

On May 2, 1962, petitioner entered the United States with a Philippine passport under a temporary visitor's visa. This visa authorized him to remain in the country only until July 31, 1962, but on application, his stay was validly extended to January 31, 1963. Petitioner remained in the United States after the expiration of his extended visitor's visa. On June 17, 1963, petitioner was served with both an order to show cause why he should not be deported from the country and a notice of hearing on this order for July 26, 1963. On August 9, 1963, the Special Inquiry Officer rendered his decision ordering deportation. Petitioner's appeal to the Board of Immigration Appeals was dismissed on October 25,

1963, and this petition for review of the final administrative decision followed.

Initially, it is apparent from the record of the administrative proceedings that there is no dispute as to the impropriety of petitioner's presence in this country after January 31, 1963, based upon his May 2, 1962 entry. Petitioner undeniably violated the terms of his extended visitor's visa. In the absence of any compelling factors leading to a contrary conclusion, petitioner's violation of his visitor's visa supports the administrative decision of deportation.

Petitioner contends, however, that although he may have acted in violation of the terms of his visitor's visa, he is entitled to permanent residence in the United States under the authority of Section 211(b) of the Immigration and Nationality Act, 8 U.S.C. § 1181(b). This provision permits the readmission of certain aliens without the necessary documentation. It provides:

> "Notwithstanding the provisions of section 1182(a) (20) of this title, in such cases or in such classes of cases and under such conditions as may be by regulations prescribed, otherwise admissible aliens lawfully admitted for permanent residence who depart from the United States temporarily may be readmitted to the United States by the Attorney General in his discretion without being required to obtain a passport, immigrant visa, reentry permit or other documentation."

Petitioner seeks to utilize this statutory provision to secure discretionary relief from the Attorney General. He insists that his return to the United States in 1962 was from a temporary departure, as required by Section 211(b). Petitioner faces a formidable obstacle, however, in attempting to sustain this argument, viz., the 1961 regulation drafted pursuant to the authority contained in Section 211(b). This regulation provides in pertinent part:

> "[A]n alien previously lawfully admitted to the United States for permanent residence who, *upon return from a temporary absence of less than one year,* was excludable because of failure to have or to present a valid passport, immigrant visa, reentry permit, border crossing card, or other document required at the time of entry, may be granted a waiver of such requirement in the discretion of the district director, or in deportation proceedings in the discretion of the special inquiry officer * * *." 8 C.F.R. § 242.7a. (Emphasis added.)

Petitioner left the United States in June 1946. He reentered the country in May 1962. In the absence of any mitigating factor, the above reasonable and authorized regulation would seemingly preclude any discretionary relief under Section 211(b).[1] Thus the issues for our consideration resolve themselves to (1) whether any mitigating factor invites a waiver of the one-year limitation for "temporary" absences under 8 C.F.R. § 242.7a, or (2) whether any other grounds exist which require that petitioner be afforded permanent residence notwithstanding his nonpossession of documentation for permanent residence.

■ In reviewing the administrative record to determine whether any legal cause exists for reversal of the deportation order, we should bear in mind at all times the superior expertise of the administrative agency whose actions we are called upon to review. At the same time, we must forever be on guard against a tendency to abdicate our function and merely rubber-stamp the administrative

---

1. Section 211(b) provides for readmission without necessary documentation *only* "in such cases or in such classes of cases * * * as may be by regulations prescribed." The *only* regulation prescribed under § 211(b) is that which gives the district director or special inquiry officer the discretion to waive the requirements for those "who * * * return from a temporary absence of less than one year." Absent additional regulations, only this limited group is granted the opportunity to apply for discretionary relief.

disposition. We are not called upon to substitute our fact-finding powers for those of the agency, but rather to insure against decisions based upon inadequate findings, findings contrary to law, or findings reached without proper regard for prescribed procedural requirements. Securities & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L. Ed. 626 (1943), 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

We hold that the record before us in this case is insufficient to enable us to determine whether discretionary or mandatory relief is available to petitioner. In particular, we find the administrative record grossly inadequate in its account of what transpired at the meeting between petitioner and the American Consul for the Philippines in late 1947 or early 1948. Due to the mistaken notion that petitioner did not qualify for non-quota immigrant status under 22 U.S.C. § 1281, both the Special Inquiry Officer and the Board of Immigration Appeals dealt only superficially with the events of that unsuccessful attempt by petitioner to gain readmission to the United States. 22 U.S.C. § 1281 provides in part as follows:

"(a) Any citizen of the Philippines who actually resided in the United States for a continuous period of three years during the period of forty-two months ending November 30, 1941, if entering the United States during the period from July 4, 1946, to July 3, 1951, both dates inclusive, for the purpose of resuming residence in the United States, shall, for the purposes of the immigration laws, be considered a non-quota immigrant * * *.

"(b) After such admission as a non-quota immigrant he shall, for the purposes of the immigration and naturalization laws, be considered as lawfully admitted to the United States for permanent residence." [2]

There can be no doubt that at the time petitioner appeared before the American Consul, he was qualified for readmission to the United States under Section 1281. Petitioner thus did not have to rely upon his reentry permit, then expired, to exercise his right to readmission. In holding that 22 U.S.C. § 1281 did not apply to petitioner, the immigration authorities were clearly in error; this is admitted by respondents in this action. Acting under this significant misconception at petitioner's hearing, the hearing officer made no specific findings with respect to the content of petitioner's alleged conversation with the American Consul. In rejecting petitioner's allegations of affirmative misstatements by the Consul, the Special Inquiry Officer stated only that:

"During the proceedings, I carefully observed the respondent, and I feel that his testimony does not necessarily represent the truth."

The Board of Immigration Appeals was somewhat more detailed in its finding that:

"The Consul marked his passport 'Cancelled' and told him his reentry permit had elapsed and there was nothing he could do for him."

Believing that the Consul was correct in informing petitioner—whether directly or impliedly—that there was no way he could gain readmission to the United States, the Special Inquiry Officer and the Board of Immigration Appeals had no reason to make further findings as to what transpired at the meeting between petitioner and the Consul.

■ If what transpired at the meeting between petitioner and the American Consul could in no way be the basis for setting aside the order of deportation,

2. This statute was promulgated to avoid any hardships that may have resulted from the imposition of the quota system on Filipinos after the declaration of Philippine independence on July 4, 1946. This provision permitted Filipinos who were resident aliens of the United States over a given period of time, but who were absent from the United States at the date of Philippine independence, to gain readmission to the United States on a non-quota status.

the failure to make adequate findings would be harmless error. There would then be no need for us to remand for further findings. It appears, however, that relief would be available to petitioner under certain *possible* findings of fact. It is not our function at this stage of the proceedings to speculate on the legal significance of each possible set of findings relating to petitioner's inquiries at Manila. The occasion is not ripe, for example, for this court to determine the consequences of a factual finding that the Consul merely told petitioner that his reentry visa had expired, and said nothing more concerning other possible methods of reentry. Rather, this court must remand for further findings to determine if *any* set of facts would give rise to a reversal of the deportation order. We hold that petitioner would be eligible for relief under at least one set of findings, viz., if it is shown that he was actually and reasonably misled by the affirmative acts and misstatements of the American Consul. To hold to the contrary if this is in fact what transpired, and deny any form of relief from the order of deportation, would result in the punishment of a poorly-educated alien for his reliance on the advice of a presumptively well-informed official of the United States Government. This we would deem improper.

Petitioner relies extensively on the third circuit opinion in McLeod v. Peterson, 283 F.2d 180 (1960) as authority for averting such an injustice. In that case, petitioner's application for suspension of a deportation order was jeopardized by his failure to meet the requirement of five continuous years' presence within the United States. Petitioner would have complied with the residency requirement had it not been for the erroneous advice of the immigration and naturalization service, advice which had resulted in petitioner's prior departure from the United States. The service had incorrectly informed petitioner that he was not eligible for nonquota status, and advised him

that his voluntary departure would aid his wife in making the necessary application for his legal reentry. The third circuit, in staying petitioner's deportation order, ignored petitioner's departure and held that he complied with the five-year presence requirement. The court held:

> "It would seem that when it can be shown convincingly that fundamental errors have been committed in prior proceedings * * *, and where a holding that the individual litigant was bound by the failures of his counsel or of the officials involved would result in a gross miscarriage of justice, such proceedings should be reopened and appropriate corrective measures taken." Id. at 184.

Petitioner in the case at bar contends that the holding in McLeod is precedent for the proposition that, if petitioner was in fact misadvised by the American Consul in late 1947 or early 1948, his reentry in 1962 should be considered a reentry from a "temporary" absence. Petitioner thus contends that his order of deportation should be stayed pending an opportunity to apply to the Attorney General for discretionary relief under 8 U.S.C. § 1181(b). Whether or not the McLeod holding would assist petitioner is a matter of considerable doubt, primarily because even at the time of his alleged meeting with the American Consul in Manila, petitioner had been outside the United States for about eighteen months, at the very least. Although the administrative regulation prescribing a one-year maximum for a "temporary" departure under 8 U.S.C. § 1181(b) was not in effect in 1948 (8 C.F.R. § 242.7a was promulgated in 1961), it is not inconceivable that petitioner's eighteen month absence before the time he was allegedly misadvised by the American Consul would be considered a period of sufficient duration so as not to be considered "temporary" within the meaning of Section 1181(b).[3] Such an interpreta-

---

3. As an indication of the widely disparate views of what constitutes "temporary,"

see United States v. Trudell, 49 F.2d 730 (2d Cir. 1931); Serpico v. Trudell,

tion of the word "temporary" would foreclose petitioner from any discretionary relief.

We do not consider it necessary, however, to decide whether the holding in McLeod justifies a holding in the present case that petitioner may have an opportunity to avail himself of the Attorney General's discretionary relief on the ground that petitioner's departure from the United States was only "temporary." Rather than speculating on the appropriateness of the McLeod holding to the facts of the present case, we find that the *reasoning* in McLeod and of the United States Supreme Court in Moser v. United States, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951) makes it manifest that we should remand for further administrative findings. Certainly, deportation of petitioner would be manifestly unjust where he possessed the statutory authority to reenter the United States in 1947 or 1948, if in fact he did not pursue that right because of a justifiable reliance upon a misstatement of a United States Government official. Congress unequivocally permitted certain Filipinos, of whom Tejeda was one, nonquota immigrant status from July 4, 1946 through July 3, 1951. If the properly developed factual findings reveal that petitioner made a bona fide effort to reenter in 1947 or 1948 and failed to obtain reentry due to the misadvice of the American Consul, the respondents should be precluded from denying petitioner what was rightly his—reentry as a nonquota immigrant in 1947 or 1948 under 22 U.S.C. § 1281.

The Moser case, alluded to above, is ample authority for the necessity of a remand for further findings in the present case. In that case, petitioner was a native of Switzerland and who had entered the United States in 1937 and had petitioned for naturalization in March 1938. On May 11, 1940, before action had been completed on his petition, Moser was ordered to return to his Swiss Army Battalion, then mobilizing against an expected German attack. In October 1940, Moser returned to the United States on leave of absence from his Swiss regiment. He soon thereafter registered under the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A. App. § 301 et seq.

In 1944, Moser was reclassified I–A, available for service. He immediately sought the assistance of the Swiss Legation in securing a deferment under the terms of a Treaty of 1850 between the United States and Switzerland which provided that:

> "The citizens of one of the two countries, residing or established in the other, shall be free from personal military service * * *."

In requesting a deferment under the terms of the Treaty, however, Moser feared the effect of his request on his pending application for United States citizenship. Under Section 3(a) of the Selective Training and Service Act, as amended, a neutral alien who claimed exemption was to be thereafter debarred from becoming a United States citizen.

The Swiss Legation took the matter up with the State Department which, after thorough consideration, decided that the Selective Training and Service Act of 1940 was not intended to deny Swiss nationals any rights or privileges conferred on them by the 1850 Treaty. The State Department thus advised that, notwithstanding the language of Section 3(a), the filing of a claim for exemption from military service by non-declarant friendly aliens like Moser should not operate as a waiver or forfeiture of naturalization rights.

When the case first came on for extensive hearing, the Naturalization Service argued that, pursuant to Section 3(a), Moser had waived his rights to naturalization by his claim of exemption from American military service. The bureau

46 F.2d 669 (2d Cir. 1928); United States ex rel. Alther v. McCandless, 46 F.2d 288 (3d Cir. 1931); United States ex rel. Lesto v. Day, 21 F.2d 307 (2d Cir. 1927); Lidonnici v. Davis, 57 App.D.C. 36, 16 F.2d 532 (1926).

asserted "that no matter what our State Department or selective service bureau had done, Moser, as matter of law, had waived his right to become naturalized, even though his specific intention to the contrary was proved and even though American government agencies had induced him to sign the 'waiver' while they were under a completely erroneous notion of what the law was." Petition of Moser, 85 F.Supp. 683, 685 (E.D.N.Y. 1949). The district court, Kennedy, J., could not accept this argument and the injustice it sought to evoke:

"[A]ssuming that the State Department made an egregious error, concurred in by the Selective Service Bureau and the Swiss Legation, I cannot see how that can be translated into a waiver by Moser of an important privilege, no matter what he signed upon the advice of these responsible agencies. In other words, even if the Swiss Treaty was intended to be broken by those who enacted the Selective Training and Service Act of 1940, I find as a fact that there never was a waiver of naturalization by Moser and that the petition should be granted." 85 F. Supp. at 685.

The second circuit, however, disagreed with Judge Kennedy, and reversed the district court decision. In so doing, the circuit court, Chase, J., held that the government was not estopped from enenforcing the provisions of the Selective Service Act debarring from citizenship an alien seeking exemption from military service. Petition of Moser, 2 Cir., 182 F.2d 734 (1950).

The United States Supreme Court reversed the second circuit, and reinstated the decision of the district court. The language of the Supreme Court opinion, Minton, J., is persuasive authority for the proposition that petitioner in the present case is entitled to have his deportation order vacated if, upon remand, the administrative findings reveal that he was misadvised by American government officials:

"[A]s we have already indicated, before petitioner signed the application for exemption, he had asserted a right to exemption without debarment from citizenship. In response to the claims of petitioner and others, and in apparent acquiescence, our Department of State had arranged for a revised procedure in claiming exemption. The express waiver of citizenship had been deleted. Petitioner had sought information and guidance from the highest authority to which he could turn, and was advised to sign Revised Form 301. He was led to believe that he would not thereby lose his rights to citizenship. If he had known otherwise he would not have claimed exemption. In justifiable reliance on this advise he signed the papers sent to him by the Legation. [341 U.S. at 46, 71 S.Ct. at 556]

\* \* \* \* \*

"There is no need to evaluate these circumstances on the basis of any estoppel of the Government or the power of the Swiss Legation to bind the United States by its advice to petitioner. Petitioner did not knowingly and intentionally waive his rights to citizenship. In fact, because of the misleading circumstances of this case, he never had an opportunity to make an intelligent election between the diametrically opposed courses required as a matter of strict law. Considering all the circumstances of the case, we think that to bar petitioner, nothing less than an intelligent waiver is required by elementary fairness. Johnson v. United States, 318 U.S. 189, 197 [63 S.Ct. 549, 87 L.Ed. 704] To hold otherwise would be to entrap petitioner." 341 U.S. at 47, 71 S.Ct. at 556.

We therefore stay the deportation of petitioner and remand the proceedings for further administrative findings consistent with this opinion. What we have stated or inferred is not to be taken as

any indication that petitioner should or should not be deported.

POPE, Circuit Judge (concurring separately).

I am entirely in accord with the court's disposition of this case and with the essential holdings of the opinion. I file this separate opinion for two reasons. I think that the matters to be considered by the administrative officials upon remand have not been defined as fully as they might be. I think also that some of the portions of the opinion are demonstrably obiter dictum.

I wish to make it clear that it is not necessary for me to discuss these dicta as it can be demonstrated that they have no bearing, one way or another, upon the outcome of this case. The court's opinion itself so indicates.

First I make it plain what I consider to be the actual decision of the court,—a decision with which I heartily agree. It may be indicated by quotation of four short extracts from the opinion as follows: "There can be no doubt that at the time petitioner appeared before the American Consul, he was qualified for readmission to the United States under Section 1281. Petitioner thus did not have to rely upon his reentry permit, then expired, to exercise his right to readmission." "In particular, we find the administrative record grossly inadequate in its account of what transpired at the meeting between petitioner and the American Consul for the Philippines in late 1947 or early 1948." "If the properly developed factual findings reveal that petitioner made a bona fide effort to reenter in 1947 or 1948 and failed to obtain reentry due to the misadvice of the American Consul, the respondents should be precluded from denying petitioner what was rightly his—reentry as a non-quota immigrant in 1947 or 1948 under 22 U.S.C. § 1281." "We therefore stay the deportation of petitioner and remand

the proceedings for further administrative findings consistent with this opinion."

For some reason not entirely clear to me, perhaps for the purpose of discussing other problems which arise in connection with the admission of aliens who have departed from the United States, the opinion discusses a 1961 regulation relating to § 211(b) of the Immigration and Nationality Act, 8 U.S.C. § 1181(b), a regulation which, as the opinion notes, was not in effect in 1948, the date which was material here. Clearly it is not necessary for me to express any view which I might have concerning the opinion's discussion of that regulation since it is obvious that no portion of that regulation is material here in the light of the holding of the court which I have quoted above, to the effect that if "petitioner made a bona fide effort to reenter in 1947 or 1948 and failed to obtain reentry due to the misadvice of the American Consul, the respondents should be precluded from denying petitioner what was rightly his—reentry as a non-quota immigrant in 1947 or 1948 under 22 U.S.C. 1281." At least the holding amounts to saying that under those circumstances petitioner would be entitled to the discretionary relief which he has sought.

Proceeding then to my other reason for writing a separate opinion, I wish to note that the opinion contains discussions of certain legal questions which may arise under certain possible findings of the administrative body. In general, I find no fault with the inclusion of such matters in an opinion of this kind, for when a case such as this must be remanded for the making of findings, and it is perfectly plain what the ultimate issues are to be, it makes for orderly judicial administration to set forth fully our view as to the law of the case and, in that connection, indicate what the consequences of certain findings must necessarily be.[1]

1. To illustrate: suppose that the reviewing court knows that on remand the trial body may find either fact (a) or fact (b). It would obviously be appropriate for the court ordering the remand to state that if the trial body finds fact (a) to exist then the holding must be in favor of the appealing party; but if the court

The disposition made by the Court in reversing and remanding the decision of a lower court in Magenau v. Aetna Freight Lines, 360 U.S. 273, 79 S.Ct. 1184, 3 L.Ed.2d 1224, illustrates the type of procedure to which I am referring. I am quite in accord with the following statement in the opinion as to what would be the consequences of certain findings that might be made on remand: "Certainly, deportation of petitioner would be manifestly unjust where he possessed the statutory authority to reenter the United States in 1947 or 1948, if in fact he did not pursue that right because of a justifiable reliance upon a misstatement of a United States Government official." [2]

In my view this decision is not complete without some further comment upon what may happen on the remand which we have ordered. I assume, of course, that it would be within the discretion of the hearing officer to receive new or additional testimony. On the other hand such testimony may possibly not be forthcoming because no other testimony or evidence is available. If no additional testimony is received, then the record previously made points to the possibility that there may have been present a set of circumstances, not mentioned in Judge Barnes' opinion, which would entitle Tejeda to relief.

Tejeda had resided in the United States for 20 years before he left for the Philippines. His passport discloses that following receipt of his reentry permit Tejeda reached Hong Kong on April 7, 1946 and was admitted in Manila on July 8, 1946; hence he was absent from the United States on July 4, 1946. Tejeda testified that it was a two-day trip which he took when he went to see the Consul at Manila from his home town at Makati. He had with him, he said, his seaman's passport which was received in evidence at the hearing. He showed this passport to the Consul; the Consul cut the corner from the passport and marked it "Cancelled". Tejeda's testimony then proceeds as follows: "You asked him how—that you wanted to get back to the United States? A. Yes, I told him I like to go back to the United States, but he said 'You cannot go any more because your entry is elapsed already.' Q. Did he hand you back your Reentry Permit? A. Yes."

The passport, here in evidence, does show the corner cut and it does show that it was cancelled with a rubber stamp which was impressed on each page of the passport. Conceivably such a rubber stamp could be ordered made and purchased in Manila but such would be the height of improbability. All this sug-

makes no comment as to the consequences of finding fact (b) to exist, although the court necessarily perceives that such may be the finding, then if the trial body makes such a finding of fact (b) and draws from that finding an impermissible conclusion or result, the resultant error would be one that should have been avoided.

2. I would take exception to certain advisory comments in the opinion which, for the reasons I have previously related, have no bearing upon the real issues and real decision in this case. Thus at one place the opinion states "Petitioner faces a formidable obstacle, however, in attempting to sustain this argument" that he was returning from a temporary departure, because of the 1961 regulation previously referred to. Again I find fault with the speculative advisory suggestion in

the opinion to the effect that "it is not inconceivable that petitioner's eighteen months absence before the time he was allegedly misadvised by the American Consul would be considered a period of sufficient duration so as not to be considered 'temporary' within the meaning of Section 1181(b). Such an interpretation of the word 'temporary' would foreclose petitioner from any discretionary relief." As I have previously noted, these comments are irrelevant in view of the holding of the opinion that if the findings reveal "that petitioner made a bona fide effort to reenter in 1947 or 1948 and failed to gain reentry due to the misadvice of the American Consul, the respondents should be precluded from denying petitioner what was rightly his—reentry as a nonquota immigrant in 1947 or 1948 under 22 U.S.C. § 1281."

gests that Tejeda went to see the Consul, that the cancellation occurred at that time and the stamp was affixed by the Consul himself.

This evidence also suggests that Tejeda was attempting to get back to the United States, that he saw the Consul for that reason and his inquiry to that end made to the Consul would naturally occur at that time. Certainly the special hearing officer might well draw such an inference and actually credit Tejeda's statement "I told him I like to go back to the United States."

Also it would be most unlikely that the passport was cancelled on Tejeda's arrival at Manila on July 8, 1946, for at that time he still had his valid reentry permit and there was no occasion for cancellation then. The hearing officer would be unlikely to assume cancellation would occur about May 2, 1962, when Tejeda obtained his visitor's visa, especially since no effort was made to produce the then Consul for testimony on this point.[3] The circumstance of the cancellation would indicate Tejeda's presence at the consulate at the time Tejeda testified he went there. If he saw the Consul the natural inquiry is, why did he see the Consul? What did he want?

The hearing officer might well have found that the consular officer knew, or had reason to know, that Tejeda was probably eligible for admission under the Philippine Trade Act. The passport, United States passport, was issued to him on August 11, 1943. That was during the war, and it is highly unlikely that a Filipino would have left the Philippine Islands for the United States after November 30, 1941. The fact that he had an American passport under these circumstances would plainly suggest that he probably did qualify on the basis of the residence in the United States for three years preceding November 30, 1941.

If Tejeda's testimony is correct, he told the Consul he wanted to get back to the United States. In my view it would be a perfectly proper finding here that the Consul told Tejeda that he could not return to the United States either falsely or without due inquiry as to the facts applicable to Tejeda.[4] It remains then to determine whether such a course of conduct by the Consul would amount to a breach of his duty to Tejeda depriving him of his rights under the Philippine Trade Act.

It is difficult to understand what a consulate is for if not to provide information under precisely these circumstances.[5] We have previously noted that duty of consular officers to familiarize themselves with the laws of immigration and visas, (footnote 4, supra). It is inconceivable that such a requirement would be made except on the assumption that the consul would make use of that knowledge and would use the knowledge in dealing with persons in need of information regarding immigration, which is to say, aliens seeking to come to the United States.

---

3. As stated by Mr. McCormick, (McCormick on Evidence, p. 533) "When it would be natural under the circumstances for a party to call a particular witness * * * and he fails to do so, his adversary may use this failure as the basis for invoking an adverse inference."

4. This was a consul, (not a "consular agent"). He was one of those foreign service officers required by the regulations (Foreign Service Regulations, 22 C.F.R. § 108.1) to "familiarize themselves with the existing laws on the subject of immigration and visas."

5. When Tejeda approached the Consul he was in possession of a seaman's passport. He had served as a seaman on exclusively American ships throughout the war. He served on Army transports all of the time in convoys in the Atlantic and the Pacific to North Africa, South America, Australia and New Guinea. Under the then existing regulations (22 C.F.R. § 110.1) he probably came within the class of "aliens who have acquired and maintained the character of American seamen." Under the then regulations, as well as under the statutes, a consular officer owed special obligations to such seamen. See 22 C.S.R.1949 ed., § 110.6 and 46 U.S.C. § 678.

Here was a man with a record of twenty years continuous residence in the United States; a man who has served as a seaman during the hazardous days of the war convoys; and a man who was denied the assistance in returning as of right to the United States owed to him by a United States Consul. As noted in McLeod v. Peterson, 3 Cir., 283 F.2d 180, 183, " * * * we are dealing with an especially critical and fundamental individual right," and, as stated in that case also, to yield to the argument that this breach of duty is not sufficient to entitle Tejeda to relief, "would be to become party to a 'bootstrap' operation by means of which officers of the United States seek to turn their own error, however, innocent, into a bar to the assertion of a right by the victim of this very error." (p. 187)