Tevita TALANOA, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 22119.

United States Court of Appeals
Ninth Circuit.

June 21, 1968.

Donald L. Ungar (argued), of Phelan, Simmons & Ungar, San Francisco, Cal., for appellant.

David R. Urden (argued), Asst. U.S. Atty., Cecil F. Poole, U.S. Atty., San Francisco, Cal., Steven M. Suffin, Attorney, Immigration & Naturalization Service, San Francisco, Cal., Ramsey Clark, Atty. Gen., of the United States, Department of Justice, Washington, D.C., for appellee.

Before KOELSCH, and CARTER, Circuit Judges, and ROGER D. FOLEY, District Judge.*

JAMES M. CARTER, Circuit Judge.

This is a petition, pursuant to Section 106 of the Immigration and Naturalization Act, 8 U.S.C. § 1105a, (hereafter "The Act"), to review a final order denying petitioner's application for status as a permanent resident.

Two questions are presented:

(1) Is the Immigration and Naturalization Service precluded from applying the provisions of Section 212(a) (14) of the Act, 8 U.S.C. § 1182(a) (14), (requiring employment certification), because the Service failed to conduct a hearing in May, 1965, when a visa became available to petitioner?

(2) Are the provisions of P.L. 89–732, enacted November 2, 1966, 80 Stat. 1161, exempting all applications for permanent residence made by Western Hemisphere natives from the requirement for employment certification, applicable to the petitioner?

### FACTS

Petitioner is a native and citizen of Tonga, an island in the South Pacific. He entered the United States at Honolulu, Hawaii, on January 15, 1963, as a student. He was 36 years old at the time. He did not register or attend school. His status was changed to that of a temporary worker after he began working in violation of his student status. This status was temporary only, and he was thereafter notified to leave the United States on or before December 11, 1963.

When petitioner did not leave, deportation proceedings were begun. A hear-

* Honorable Roger D. Foley, Chief Judge, District of Nevada.

ing was held on February 24, 1964, at Honolulu, where petitioner was then living. Petitioner conceded deportability, but applied for adjustment of status to that of a permanent resident, pursuant to Section 245 of the Act, 8 U.S.C. § 29, 1965.[1]

On February 24, 1964, the special inquiry officer found the petitioner to be a deportable alien and denied his application under Section 245 of the Act, 8 U.S.C. § 1255, on the ground he had not established availability of an immigrant visa under the quota for the Asia-Pacific Triangle to which he was chargeable at a native of Tonga. Petitioner was granted the privilege of voluntary departure.

Thereafter the State Department recognized Tonga as a separate quota area. A motion to reopen petitioner's file was denied on November 19, 1964, because the non-preference category of the Tonga quota was oversubscribed. The Board of Immigration Appeals dismissed an appeal from this denial on January 29, 1965.

On March 9, 1965, petitioner again moved to reopen his case. He alleged the availability of immigrant visas under the nonpreference portion of the Tonga quota. This motion to reopen was granted by the Board on March 23, 1965. The Honolulu office of the Service received the Board's remand order on March 29, 1965. The Honolulu office had previously, on March 15, 1965, re-

quested the State Department to assign Tongan quota numbers for the Service's use. The State Department allocated such quota numbers in May 1965. The allocation was made before the Honolulu office knew whether petitioner was eligible for adjustment of status, pursuant to Section 245 of the Act, 8 U.S.C. § 1255.[2]

There was no special inquiry officer in Hawaii and none had been assigned to conduct hearings during the month of May. On May 10, 1965, the quota numbers were returned by the Service to the State Department, "because they could not be used during that month (May), since the cases had not yet been completely processed and reopened hearings could not be held during the month of May." (Decision Board of Immigration Appeals, August 11, 1967).

On April 26, 1965, petitioner's counsel had written the District Director at Honolulu, regarding "Tongan Cases." He requested any up-to-date information with respect to the scheduling of further hearings in those cases. The letter made no reference to petitioner by name nor to his case in particular. Apparently he was notified that hearings were to be calendared in June of 1965. In any event, on June 2, 1965, official notice of hearing was issued to petitioner and his counsel, and on June 22, 1965, at Honolulu, a hearing was held in petitioner's case. A visa was not then available for petitioner and the special inquiry officer reserved making a decision. Before a

---

1. 8 U.S.C. § 1255(a) reads as follows: "(a) The status of an alien, other than an alien crewman, who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigration visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is approved."

2. This was *unusual* procedure since a quota number is not usually requested until it has been ascertained that the alien is otherwise eligible for permanent resident status. The reason is because 8 U.S.C. § 1255 requires that a visa be available at the time the application for change of status is approved. Such application cannot be approved until all the proper documents are filed and the fees paid. In this case, petitioner did not even become eligible until April 13, 1965, when his medical certificate was issued. Since the State Department issues a quota number for only one month, the number is not usually requested until the application has been approved.

quota number again became available for petitioner's use, Congress on October 3, 1965, and effective as of December 1, 1965, amended Section 212(a) (14) of the Act, 8 U.S.C. § 1182(a) (14),[3] to require the submission of a certification from the Secretary of Labor establishing the eligibility for permanent resident status.

On August 6, 1965, petitioner moved to California where he now lives. Further hearings were held before a special inquiry officer. On January 13, 1966, petitioner's application for status as a permanent resident was denied. The denial was based on the requirement of certification by the Labor Department. An appeal was dismissed by the Board of Appeals on May 17, 1966.

A petition for rehearing was filed on July 12, 1966, alleging that because petitioner had started his own business as a gardener, he was not subject to Section 212(a) (14) of the Act, 8 U.S.C. 1182 (a) (14), since the section did not apply to one self-employed. Petitioner also contended, for the first time, that the Service was estopped from requiring a labor certificate because a quota number had been made available to petitioner prior to the enactment of the amendment to Section 212(a) (14) of the Act, 8 U.S.C. § 1182(a) (14).

The special inquiry officer rejected the estoppel argument but found petitioner to be exempt from the labor certification requirement. Adjustment of status as a permanent resident under

Section 245 of the Act, 8 U.S.C. § 1255 was granted on September 21, 1966.

Petitioner thereafter lost his business and went to work as a laborer. On March 13, 1967, the Immigration Service moved to reconsider petitioner's status. The Service alleged that petitioner was a laborer and was not exempt from the labor certification requirement as a self-employed person. On April 17, 1967, the Board granted the motion and remanded the case to the special inquiry officer. At the reopened hearing held on April 27, 1967, petitioner admitted he was employed as a laborer and withdrew his claim of exemption from the labor certification requirement. The special inquiry officer found petitioner ineligible for adjustment of status under Section 245 of the Act, 8 U.S.C. § 1255, but gave petitioner the privilege of voluntary departure. Petitioner's appeal from the officer's decision was dismissed by the Board of Appeals on August 11, 1967. This petition for review then followed.

## DISCUSSION

■ Section 245 of the Act, 8 U.S.C. § 1255 as amended, gives the Attorney General discretionary power to change the status of an alien from non-immigrant to permanent resident if "(1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is

---

3. 8 U.S.C. § 1182(a) (14) after the amendment reads as follows:

"(14) Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed. The exclusion of aliens under this paragraph shall apply to special immigrants defined in section 1101(a) (27) (A) of this title, (other than the parents, spouses, or children of United States citizens or of aliens lawfully admitted to the United States for permanent residence), to preference immigrant aliens described in sections 1153(a) (3) and 1153(a) (6) of this title, and to nonpreference immigrant aliens described in section 1153(a) (8) of this title; * * *."

immediately available to him at the time his application is approved."

Pursuant to the statute, an applicant must first become eligible for the relief sought. In order to become eligible, an applicant for adjustment of status is assimilated to the position of an applicant for entry into the United States. An applicant must therefore comply with a procedure assimilated to admission.

▬ In this case, Petitioner had been eligible for the relief sought when he first applied for it. He became ineligible by virtue of the change in the law, to-wit, he became unable to obtain a labor certification pursuant to Section 212(a) (14) of the Act, 8 U.S.C. § 1182(a) (14). It is settled that when the law is changed before a decision is handed down by an administrative agency, the agency must apply the new law. Patsis v. Immigration and Naturalization Service, 337 F.2d 733 (8 Cir. 1964); cert. den. 380 U.S. 952, 85 S.Ct. 1085, 13 L.Ed.2d 970; DeLucia v. Immigration and Naturalization Service, 370 F.2d 305 (7 Cir. 1966); cert. den. 386 U.S. 912, 87 S.Ct. 861, 17 L.Ed.2d 784. Since the provisions of Section 212(a) (14) of the Act, 8 U.S.C. § 1182(a) (14), applied to petitioner, the only question remaining is whether petitioner is exempt from obtaining a labor certification.

### (1) *Estoppel*

▬▬ Petitioner's first claim of exemption from the labor certification is based on the grounds of estoppel. It is contended that it was the Government's conduct which prevented the Petitioner from becoming a permanent resident prior to the enactment of Section 212(a) (14) of the Act, 8 U.S.C. § 1182(a) (14), to-wit, a quota number was made available to petitioner in May 1965, and no hearing was held until June 22, 1965,

after the quota number was returned to the State Department. The contention is invalid.

An applicant for adjustment of status is assimilated to the position of an applicant for entry, Amarante v. Rosenberg, 326 F.2d 58 (9 Cir. 1964), and he must comply with the requirements of entry. An alien against whom deportation proceedings have been brought must submit his application to a special inquiry officer during the deportation proceedings. 8 C.F.R. 245.2.

The Honolulu office apparently disregarded the normal administrative procedure when it requested the State Department to assign a quota number for Petitioner's use on March 15, 1965, since petitioner's motion to reopen his case was not even received until March 23, 1965, and his eligibility was not determined until April 13, 1965, when the medical certificate was issued.

From March 23, 1965, when the motion to reopen was granted, there was no action taken by petitioner or his attorney to obtain a hearing except the letter of April 26, 1965, referred to above, inquiring generally about the "Tongan Cases." [4]

When petitioner and his counsel were notified that his hearing had been set for June 1965, at a time when a special inquiry officer would be available in Honolulu, there was no attempt on the part of petitioner or his counsel to secure an earlier date for hearing or a transfer of the case to the mainland where a special inquiry officer might have been available. It is unreasonable to now charge the respondent with the responsibility of having the foresight to enable it to predict a change in the law or the unavailability of future quota numbers.[5]

---

4. Petitioner concedes in his brief the following: "Although it may not appear from the record, both the government and the petitioner knew as early as March 1965, that the quota for Tonga would remain current only until the end of that fiscal year, i. e., the months of April, May and June of 1965. Such in-

formation was relayed by the State Department to the Immigration and Naturalization Service early in March of 1965."

5. In discussing the special inquiry officer's decision, the Board of Immigration Appeals, in its decision of August 11, 1967,

In his argument for estoppel, petitioner relies on Tejada v. United States Immigration and Naturalization Service, 346 F.2d 389 (9 Cir. 1965). This case, and others cited by petitioner, are clearly distinguishable from the instant case. *Tejada* involved the claim by an alien that he had been given demonstrably erroneous information by a government official and that because of his reliance thereon, he was prevented from obtaining the necessary documentation to return to the United States on a non-quota visa during the period when such admission was possible. The Court remanded the case for further hearing, stating:

"* * * We hold that petitioner would be eligible for relief under at least one set of findings, viz., *if it is shown that he was actually and reasonably misled by the affirmative acts and misstatements of the American Consul.* To hold to the contrary if this is in fact what transpired, and deny any form of relief from the order of deportation, would result in the punishment of a poorly-educated alien for his reliance on the advice of a presumptively well-informed official of the United States Government. * * * " [Emphasis added.]

To warrant an estoppel,[6] the fact situation must be a glaring and obvious one, to-wit, that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. Dickerson v. Colgrove, 100 U.S. 578, 25 L.Ed. 618 (1879); see also Gus v. Brooklyn Eastern Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959).

We can find nothing in the record to indicate that the Service, by its language or conduct, led petitioner to any course of action which he would not otherwise have taken, or led him to change his situation in any way, whether to his detriment or otherwise. What appears in the record is that the Service, acting with perhaps excessive diligence, obtained a quota number for petitioner prematurely, before it had reached the point in the processing and hearing of his case at which the quota number could be used. When the quota number was returned, neither the Service, petitioner or his counsel, or even the State Department could have said with any certainty that another number would not be available to petitioner when the processing of his case was completed, or that the Act would be amended so as to require a labor certification.

The two other cases relied on by petitioner, Petition of Vacontios, 155 F. Supp. 427 (S.D.N.Y.1957), and Application of Martini, 184 F.Supp. 395 (S.D. N.Y.1960), both involved naturalization under special eligibility provisions, which petitioners had met at the time when their applications were filed. In each instance, the provisions had a statutory limitation on their period of effectiveness, and the date of expiration was specifically set by the statute. In each case there was indication that the Ser-

---

quoted the special inquiry officer as follows:

"* * * Assuming that counsel for the respondent had intended to arrange for the respondent to come to the mainland for a hearing in May 1965 had he been informed of the assignment of a quota number for the respondent's use during May, it is unreasonable in the light of Service practice, counsel's familiarity therewith, and his silence to have expected the Honolulu office to have divined his unmentioned intention and *sua sponte* to have in-

formed him the respondent's case was ready for hearing and that a quota number had been assigned for use in May, but that hearing could not be held in Hawaii that month, to give counsel an opportunity to arrange for a hearing outside the Hawaii district. * * * (Decision, p. 8)."

6. We do not decide whether there can exist an estoppel against the United States or a government agency. The question is in doubt. We say that in any event there was no factual basis for an estoppel in this case.

vice had not proceeded with due diligence to fulfill its responsibility in processing these cases after a timely filing of the applications. On a showing of the above facts, the court in each case held that the applicant's rights had been preserved by a timely filing of his application.

In the instant case, there was no indication whatever of any deadline for any phase of eligibility. It would be unreasonable for petitioner to expect the Service to possess the clairvoyance necessary to have known that the law would be changed four or five months after the quota number was returned. There was no reason to think of having a special inquiry officer make a special trip from the Mainland to hear the petitioner's case, or to suggest that petitioner might wish to take a trip to the Mainland for a hearing there. There is no showing that other than normal processing of the case was indicated, and no showing that the Service was in any way remiss in its actual processing of the case.

### (2) *Public Law 89–732*

 Petitioner's second claim of exemption is based upon Pub.L. 89–732,

enacted November 2, 1966, 80 Stat. 1161.[7] This law is entitled "Cuban Refugees; Adjustment of Status." It is an exception to Section 245(c) of the Act, 8 U.S.C. § 1255(c), which provides:

"(c) The provisions of this section shall not be applicable to any alien who is a native of any country of the Western Hemisphere or of any adjacent island named in section 1101(b) (5) of this title."

The law, prior to passage of P.L. 89–732, precluded natives of any country of the Western Hemisphere from applying for adjustment to permanent resident status while in the United States. Pub. L. 89–732, merely exempts those refugees from Cuba from the restriction against adjustment of status in the United States. (1966 U.S. Code Cong. and Adm. News, p. 3793). There appears to be no authority which extends the exemption to classes of aliens other than natives of the Western Hemisphere. It is within the power of Congress to make such distinctions in legislation affecting aliens. Kaoru Yamataya v. Fisher, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903).

The order is affirmed.

---

7. P.L. 89–732, 80 Stat. 1161: CUBAN REFUGEES—STATUS
"Notwithstanding the provisions of section 245(c) of the Immigration and Nationality Act, [subsec. (c) of 8 U.S.C. 1255] the status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least two years, may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence * * * ."

"Sec. 3. Section 13 of the Act entitled 'An act to amend the Immigration and Nationality Act, and for other purposes,' approved October 3, 1965 (Public Law 89–236) [amended subsecs. (b) and (c) of 8 U.S.C. § 1255] is amended by adding at the end thereof the following new subsection:
'(c) Nothing contained in subsection (b) of this section [amended subsec. (c) of § 1255] shall be construed to affect the validity of any aplication for adjustment under section 245 [§ 1255] filed with the Attorney General prior to December 1, 1965, which would have been valid on that date; but as to all such applications the statutes or parts of statutes repealed or amended by this Act [P. L. 89–236] are, unless otherwise specifically provided therein, continued in force and effect.' "