**KENT HOMES, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. T–3192.**

United States District Court
D. Kansas.

Nov. 13, 1967.

Barney J. Heeney, Jr., Topeka, Kan., for plaintiff.

Newell George, U. S. Atty., Elmer Hoge, Asst. U. S. Atty., Topeka, Kan., for defendant.

## MEMORANDUM OF DECISION

TEMPLAR, District Judge.

Plaintiff, on September 28, 1962, instituted this action by filing a complaint in which it was alleged in substance that plaintiff, as a corporation, timely filed its income tax return for the fiscal year beginning February 1, 1957, and ending January 31, 1958, and paid taxes shown due thereon. A tax deficiency was imposed in accordance with the reviewing agent's report dated March 29, 1962, and a deficiency of $69,980.31, plus interest, was paid by plaintiff on June 12, 1962. A proper claim for refund was made by plaintiff July 19, 1962, and was rejected by the District Director on September 12, 1962.

For its answer to this complaint, the defendant, United States of America, denies substantially all of the allegations of the complaint except it admits the existence of the plaintiff as a corporation; that it did erect the housing on the Wherry Project at Fort Leavenworth; that it did secure financing from the New York Life and that the loan was insured by FHA. The defendant also admits the filing of the tax return by the plaintiff, the reassessment by the examining agent, the payment of the deficiency by plaintiff and the filing of a claim for refund by plaintiff and its rejection by the District Director of Revenue.

Following discovery proceedings and on July 23, 1964, a pretrial conference was held before the Court. This resolved a number of the basic facts which must be considered by the Court and among other things, the following items were stipulated:

1. That the plaintiff, Kent Homes, Inc., is a Kansas corporation.

2. That this is a refund suit involving federal income taxes for the fiscal year ending January 1, 1958, and the amount in controversy is $69,980.31.

3. That plaintiff reports its income on an accrual basis and its fiscal year ends January 31 of each year.

4. There is no question of jurisdiction of the Court.

5. In 1951, under the Wherry Military Housing Act, plaintiff constructed and operated single-dwelling rental houses located at Fort Leavenworth, Kansas, for military personnel.

6. The houses were built upon land leased by the plaintiff from the Secretary of the Army for a seventy-five year term.

7. The lease agreement contained the following provisions:

(a) Upon expiration of the lease, plaintiff could remove the houses and those not removed passed to the federal government.

(b) Consent from the Division of Engineering of the Department of the Army was required before the lease could be assigned.

8. To finance house construction, plaintiff gave notes secured by mortgage on houses to Prudential Investment Company and these were assigned to the New York Life Insurance Company.

9. The note was insured by the Federal Housing Administration.

10. On December 18, 1957, the Department of the Army commenced condemnation proceedings *against the equity* of the plaintiff in the Wherry project under the terms of the Capehart Act, 42 U. S.C. § 1594a(b). (Emphasis supplied)

11. On December 18, 1957, the Department of the Army deposited a treasury check in the amount of $137,000.00 with this Court. Of this amount, $83,000.00 represented the Department's estimate of the fair market value of the plaintiff's equity in the Wherry project here involved.

12. Effective January 1, 1958, this Court ordered possession of the Wherry project transferred to the Department of the Army.

13. On February 14, 1958, plaintiff made application to this Court for withdrawal of the $83,000.00.

14. The taxpayer asserts that the withdrawal of the deposited amount was contingent upon the execution of an agreement among the Department of the Army, the New York Life Insurance Company and the Federal Housing Administration.

15. Attached to the pretrial order is Exhibit "A" which the parties have agreed is a copy of the three-party agreement. *The parties disagree as to when the Department of the Army assumed the mortgage.* (Emphasis supplied)

16. On March 19, 1958, the $83,000.00 was paid over to the plaintiff.

17. In the three-party agreement, there were provisions for releasing plaintiff from further liability on the note held by New York Life Insurance Company but these provisions were specifically stricken from the agreement by drawing lines through the provisions and such removal initialed by each of the parties to the contract.

18. The three-party agreement also provided that the leasehold interest was not to be merged with the fee interest.

19. The plaintiff disagreed with the Department of the Army's determination of the fair market value of plaintiff's equity in the Wherry project and *also contended that the Department of the Army could not condemn an equity.* (Emphasis supplied)

20. The disagreement between the parties brought the matter before this Court. Commissioners were appointed by the Court to hear the case and made a report to the Court.

21. In its return for fiscal year ended January 31, 1958, plaintiff included the following:

On December 18, 1957, the United States Government condemned and took over the fixed assets and assumed the mortgage against the property. The United States Government's settlement offer was rejected by Kent Homes, Inc.; the United States District Court will decide the case sometime in 1958. Since the sale price is undetermined, the balance sheet and income statement do

not reflect the condemnation of the property. However, such items as depreciation, interest on the mortgage, real estate taxes and house rentals are on an eleven-months' basis.

22. The related corporation, Marshall Homes, Inc., also held an interest in the Wherry project and was a party to the condemnation proceedings.

23. In August, 1961, the Commissioners issued their report and determined the total value of the equity of both the plaintiff and Marshall Homes, Inc. to be $308,030.00.

24. The accountants for the plaintiffs allocated this total base upon each corporation's adjusted basis in the Wherry project. Plaintiff's share of the value of the equity was $200,219.50.

25. Plaintiff's income tax return for fiscal year ended January 31, 1958 was examined by the Internal Revenue Service and the Revenue Agent's report dated March 29, 1962, determined that the plaintiff realized gain for that year from the condemnation as follows:

Amount deposited, $83,000.00.

Assumption of note and mortgage balance as of January 1, 1958, $1,211-148.09.

Gross realized, $1,294,148.09.

Adjusted basis in Wherry project, $1,-014,226.86.

Gain per Agent's report, $279,921.23.

26. The gain as determined in the Revenue Agent's report was treated as taxable gain and created an income tax deficiency of $69,980.31, which is the amount in controversy. This amount was paid June 12, 1962.

27. On September 7, 1962, this Court issued a memorandum opinion on reviewing the Commissioners' report approving the valuation as determined by the Commissioners. A copy of the memorandum opinion is attached to the pretrial order as Exhibit "B".

28. The memorandum opinion also held that since the three-party agreement did not release the plaintiff from its liability under the note and mortgage, the equity could not be condemned, and if there was to be a valid condemnation, the entire gross estate would have to be condemned.

29. An agreement entitled "Supplemental Agreement" and dated September 26, 1962, was received shortly after that date. This agreement was signed by the New York Life and it released the plaintiff from further liability under the note and mortgage relating to the Wherry project. A copy of this agreement is attached to the order as Exhibit "C".

30. A copy of the motion for reconsideration of the memorandum opinion and order of September 7, 1962, was filed on behalf of the Department of the Army. A copy of this motion is attached to the order as Exhibit "D".

\* \* \* \* \* \*

The pretrial order likewise contains a "Statement of Issues." They appear as follows:

1. Whether the $83,000.00 deposited was a realized gain to the taxpayer in fiscal 1958. The determination of this question will involve the consideration of the following questions:

(a) What was the effective date of the three-party agreement with respect to any rights or obligations of the taxpayer?

(b) When did the taxpayer have the right to withdraw the $83,000.00?

(c) Did the three-party agreement leave the taxpayer contingently liable for the mortgage?

(d) Would any such contingent liability bar the treatment of the deposit as a gain realized in the year in suit?

2. When did the Army's assumption of the mortgage result in a realized gain to the taxpayer? The determination of this question will involve the consideration of the following questions.

(a) What was the effective date of the three-party agreement with respect to any rights or obligations of the taxpayer?

(b) Did the three-party agreement leave the taxpayer contingently liable for the mortgage?

(c) Would any such contingent liability bar the treatment of the assumption of the mortgage as a gain realized in the year of suit?

3. In the event it is determined that the $83,000.00 deposit was accrual in fiscal 1958, was the deposit taxable as gain for such fiscal year or is it to be first applied against the basis of the condemned property?

4. Was the assessment timely with the provisions of § 6501 or § 1033 of the Internal Revenue Code of 1954.

The Court then directed that the pretrial order and stipulations should supersede all pleadings and should control the subsequent course of the action and should not be modified except by order of the Court on its own motion or a motion.

\* \* \* \* \* \*

Thereafter, trial of said cause took place before the Court on April 16, 1965. The parties requested that they be given an opportunity to present briefs, which request was granted by the Court. The reply brief of the defendant was filed with the Court on October 17, 1967. From defendant's original brief filed September 22, 1967, the Court finds a general statement of defendant's position. Likewise, it includes, with some important exceptions that will be hereafter noted, the substance of the facts before the Court.

These are facts to which the parties stipulated:

The plaintiff taxpayer, Kent Homes, Inc., is a Kansas corporation; the plaintiff kept its books and reported its income on the accrual method of accounting on the fiscal year ending January 31. In 1951, under the Wherry Military Housing Act, the plaintiff constructed and operated single-dwelling rental houses located at Fort Leavenworth, Kansas; the houses were constructed on land leased from the Secretary of the Army for a seventy-five year term; plaintiff financed the construction of the houses through loans obtained from the Prudential Investment Company and secured by a mortgage upon the houses; subsequently the note and mortgage was assigned to the New York Life Insurance Company; the note was insured by the Federal Housing Administration; on December 18, 1957, the Department of the Army commenced condemnation proceedings against plaintiff's equity in the project and on the same date deposited in the registry of the Court the sum of $83,000.00 representing the Department's estimate of the fair market value of the plaintiff's equity in the project. By order of the Court, possession was transferred from the plaintiff to the Department of the Army effective January 1, 1958. The plaintiff did not make application to the Court for withdrawal of the $83,-000.00 until February 14, 1958; that same was paid to the plaintiff on March 19, 1958. Plaintiff did not agree with the Department's estimate of the fair market value of plaintiff's equity with the result that Commissioners were appointed by the Court to determine the value. Plaintiff was subsequently awarded $200,219.50. On plaintiff's income tax return for the fiscal year ended January 31, 1958, plaintiff made note of the condemnation proceedings but did not take the $83,000.00 into its computation. Upon audit of the return, the Internal Revenue Service determined that the $83,-000.00, coupled with the assumption of the note and mortgage balance by the Department of the Army in the sum of $1,211,148.09, resulted in a gain of $279,921.23. This resulted in the assessment of a deficiency of $69,980.31, which sum was paid by the plaintiff on June 12, 1962.

The question of statute of limitations has been eliminated from the case and the question, as stated by the defendant, is this:

"Whether or not the plaintiff realized a taxable gain in the amount of $279,-921.23, from the condemnation of its property by the Army in its fiscal year ended January 31, 1958." (Page 1 of brief)

■ There is no dispute between the parties that under the accrual method of accounting, income is reported when all the events have occurred which fix the right to receive the income and the amount can be determined with reasonable accuracy. Thus, it is the right to receive income, and not the actual receipt, that determines inclusion of the amount in gross income * * *. See 33 Am. Jur.2d, Federal Taxation § 2580.

■ The application of the above statement requires interpretation of the so-called "Claim of Right Doctrine." Once a taxpayer receives earnings under a claim of right and *without any restrictions* as to its disposition, it is taxable to him, notwithstanding that his right to retain it is disputed and that he may be required to return it. This is so whether the taxpayer is on the cash or the accrual method of accounting. See 33 Am.Jur.2d, Federal Taxation § 2581, page 696; and General Baking Company, 48 T.C. 201.

That the foregoing is an accurate statement of law, seems to be clear. The controversy here arises from the fact that the defendant claims the plaintiff had the right to withdraw the deposit of $83,-000.00 upon its deposit by the plaintiff in the condemnation proceeding prior to January 31, 1958, which date was the end of plaintiff's fiscal year for tax purposes.

On the other hand, the plaintiff contends that in line with the authorities quoted and cited, that income is not reportable when all the events necessary have not occurred to fix right to receive the income.

So we are left with the problem of determining in this case, whether all events did occur which fixed plaintiff's rights to receive the gain or loss from the sale or exchange of property prior to January 31, 1958. See 34 Am.Jur.2d, Federal Taxation § 4080, page 22.

Were it not for the peculiar methods initially used by the government in undertaking to acquire possession of plaintiff's property, this serious question might not have so arisen. *The scheme devised* to acquire plaintiff's right to possession of the housing project by fragmenting the existing rights and interest of plaintiff, a plan this Court could not uphold, produced a situation resulting in substantial uncertainty as to the rights of all the parties in interest. So much so, in fact, that not until March 18, 1958, did the government's representative *sign* and *acknowledge* a three-party agreement which undertook among other things, to "provide for the fixing and determination of other rights and obligations of the parties hereto resulting from or arising out of the property interests and transactions identified above." (Page 3 of three-party agreement).

The "transactions identified above" referred to the condemnation proceeding instituted by the government together with a declaration of taking to acquire all the interests of Kent Homes arising out of a lease between Kent Homes and the Secretary of the Army.

Though not mentioned by the government, these three parties to the agreement were also parties, along with Kent Homes, Inc., to the condemnation proceeding that was then pending. While the government argues that since the agreement was made effective as of December 18, 1957, it must be considered as having been made on that date, such contention cannot be accepted by the Court. The agreement was made when it was signed and acknowledged by the parties to it. This last occurred in March, 1958. The parties apparently felt that the agreement had substantial bearing on the issues to be determined in the condemnation proceeding, for it provided in (Article X) that it might be used as an exhibit in that proceeding or otherwise. The parties have stipulated that in the three-party agreement, the provision releasing plaintiff from further liability on the New York Life note was stricken from the agreement by drawing lines through such provisions, (see Stip No. 17) so plaintiff was still bound on this obligation and continued to be so until September 26, 1962, when New York Life

executed such release by a "Supplemental Agreement." (Exhibit "C".)

Such release was executed by New York Life to plaintiff after this Court had held in its decision, entered in the condemnation proceeding on September 7, 1962, that the government's attempt to limit the estate it acquired in Kent Homes property, "subject to mortgage" could not be sustained and that the government could not condemn the equity of Kent Homes but must condemn the entire gross estate for this is the only way liability of Kent on the mortgage, which it had given its mortgagee, could be effectively terminated, and without this, whatever award may be made to Kent Homes could not be reasonably said to be just compensation.

The uncontroverted evidence produced at the trial discloses that when the condemnation proceeding was forwarded to the United States Attorney for the District of Kansas by the Lands Division of the Department of Justice, the United States Attorney was carefully instructed as to how he was to proceed. He was directed that the action was to be brought under Public Law 1020, 84th Congress, 2nd Session, which specifically relates to the acquisition of Wherry Housing Projects, and that although the law contemplates acquisition of these projects subject to mortgages, the precise effect upon these mortgages is not quite clear and for this reason the mortgagees should be made parties in the case. The United States Attorney followed these instructions. The directive to the United States Attorney also stated that though a check for $137,000.00 would be sent to him to be used with the Declaration of Taking, it is suggested that no distribution of funds deposited in this case should be made in advance of notice and the lapse of sufficient time to permit the filing of answers and the *assertion of claims*. The directive further stated to the United States Attorney that, "This suggestion is made for the principal reason that the rights of the mortgagees to claim a portion of the deposit are not entirely clear in the absence of a careful study of the involved agreements and generally limited assets of the sponsor corporation." The United States Attorney was also told that, "In view of the peculiar nature of the proceedings, it is suggested that no stipulations be filed involving any monetary considerations without first obtaining approval from the Department. (Presumably this meant the Department of Justice.)

It is not claimed by the government that prior to January 31, 1958, any such approval was given for distribution of the deposit, nor is it claimed that the government would not have opposed any attempt on the part of Kent Homes to withdraw the deposit. The Court finds that the U. S. Attorney in charge of the case was instructed to prevent this. Obviously, the government itself was uncertain as to how the deposit was to be disbursed and to whom payment would be made or what effect would result in the event of such distribution, as matters stood on and before January 31, 1958.

The precautions taken by the government were commendable. It recognized that the limited assets of Kent Homes might make difficult any recovery from it should it come into possession of the deposit and thereafter he held not entitled to receive it.

These instructions from the government to the United States Attorney in charge of the condemnation case are scarcely consistent with the government's contention now before the Court, that the deposit "was available to them (Kent Homes) at all times subsequent to its deposit in the registry of the Court on December 18, 1957." T.19.

As argued by the government, the purpose of 40 U.S.C. § 258a, which provides for deposit of estimated compensation with the Declaration of Taking, is to give the former owner, *if his title is clear,* immediate cash compensation to the extent of the government's estimate of the value of the property. It is payment on account, to hold otherwise would be to deny the owner the immediate use of the cash approximating the value of his land. T. 22.

That this is the law is beyond cavil. The only trouble with the government's present claim is that its own act, its own uncertainty, its own parsimonious position left the property owner on and before January 31, 1958, in a position where he did not possess the "present unfettered right to use these funds as its own for any purpose." See Vol. 2, Mertens Law of Federal Income Taxation, § 12.103, p. 322. This right was being denied to Kent Homes by the very government which now asserts an inconsistent claim against the taxpayer.

It is clear from the record in this case that Kent Homes did not have the fixed right to receive the deposit made by the government in December, 1957 because a number of things remained to be done and this at the government's insistence. The right of Kent Homes to take the deposit was finally determined in March, 1958.

The uncontradicted testimony of the witness Lester Goodell, a respected member of the Bar of this Court who was then acting as counsel for Kent Homes, confirms that a good many things remained undecided and undetermined because of the government's indecision and uncertainty at the time. Goodell testifies in substance on April 16, 1965, that:

The condemnation proceeding was still going on, seven years after it had been commenced; that the action had been assigned to a Mr. Ward, an Assistant United States Attorney at Topeka, for handling on behalf of the government when the action was instituted; that Mr. Ward was in charge of the case and that he had numerous conversations with Ward about withdrawal of the deposit in the case; that this wasn't an ordinary case, it's the extraordinary case of condemnation; that he had preliminary conferences with Ward before the case was filed, that the property to be taken was subject to a mortgage, that the taking did not include the stoves, refrigerators, the washing machines in the 225 houses being acquired; that these personal property items were to be excluded from the condemnation; that he told Ward his client was being dispossessed of the houses with no place to put the stoves and furnishings and that they were under chattel mortgage to the mortgagee, New York Life, and that the mortgage contained a covenant that they would never be removed from the housing and since they were not condemned, Kent Homes would be violating the covenant if they removed from the houses such furnishings which were under chattel mortgage. Goodell further testified that he went back to Washington and to New York and discovered that a three-party agreement between the FHA Commissioner and the Department of the Army and the mortgagee was being considered. Kent Homes was not a party to this proceeding and was apparently not consulted. He also learned that these parties were going to object to Kent Homes claiming the money, that he talked to lawyers in the Lands Division in Washington and learned that there was a dispute going on between the government and the mortgagee in relation to the expenses incurred by New York Life; that New York Life was not going to release Kent Homes from liability on the original mortgage note; that he remembered talking with Mr. Ward regarding the distribution of the $83,000.00 then on deposit in the Court; that Ward talked with him about the letter (Exhibit 1) and Ward told him he couldn't tell Goodell whether or not Kent Homes would be free to file an application with the Court to withdraw the money; at that time the three-party agreement had not been made. Goodell further testified that his discussions with Ward resulted in a tacit understanding that Kent Homes would hold in abeyance the matter of applying for distribution of these funds to await the outcome of negotiations for the three-party agreement and see whether the mortgagees were going to waive claim to the proceeds of the condemnation, including the deposit. It was his understanding from

discussions with Ward that Kent Homes would "hold in abeyance until that thing could be resolved, that is, hold in abeyance our making application for the fund." T.33.

It is obvious that Kent Homes did not have the unfettered right to receive the money on deposit with the Clerk on or before January 31, 1958, and the Court so finds. As stated by Judge Huxman in United States v. Harmon, 10 Cir., 205 F.2d 919, 920:

"It is a well settled principle of law that where a taxpayer keeps his books and files his returns on the accrual basis, income is to be accounted for in the year in which it is realized, irrespective of when it is ultimately received. It is the right to receive and not the actual receipt of income that determines when income must be included in gross income for income tax purposes. *When the right to receive income becomes fixed and absolute the duty of one on the accrual basis to report it arises.*"

In that opinion, Judge Huxman pointed out that a number of things remained to be done which the determination of the amount depended. There were audits to be completed, there were outstanding claims to be determined and paid, and that even though they might be small, it could not be determined whether much or little would be deducted or whether any amount would remain for payment to Harmon. Such was the government's position in this case up until the time of the execution and filing of the three-party agreement and the government's election to now ignore such facts is simply evading a condition the government itself created. Not only did the government in this case stand in the way of plaintiff's right to receive the money on deposit, it remained to be determined whether plaintiff would ever have the right to receive it, and if so, what deductions or allowances might be made from any amount determined to be due it.

As Judge Bratton pointed out in the case of Commissioner of Internal Revenue v. Security Flour Mills, 10 Cir., 135 F.2d 165, 167:

"Revenue received under claim of right *without restriction* in respect to its use or disposition constitutes taxable income, even though the one receiving it may thereafter be adjudged liable to restore it or its equivalent." (Emphasis supplied) Citing North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 and Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725.

The Burnet case is cited as authority for the above decision and that case flatly holds that a taxpayer has received income under a claim of right *when it is available to him without restriction as to its disposition.*

The instructions contained in the letter from the Department of Justice to United States Attorney Farmer (Exhibit 1) makes it unmistakably clear that the United States Attorney's office in Kansas was not to permit the deposit of estimated value to be available to anyone until after sufficient time had elapsed for answers and assertions of claims (by interested parties) "for *the principal reason* the rights of the mortgagees to claim a portion of the deposit are not entirely clear in absence of a careful study of the involved agreements and *the generally limited assets of the sponsor corporation.*"

The negotiations on the part of Kent Homes, conducted by Goodell, the plaintiff's then attorney, with Mr. Ward, the Assistant United States Attorney in charge of the condemnation proceeding, as shown by Goodell's testimony, confirms the fact that the government was not going to permit any distribution of the deposit until the government could have assurance that its distribution to Kent Homes would be free from claims of the other interested parties in the condemnation case. In other words, until it could be determined who would be entitled to receive the money deposited.

Until the three-party agreement mentioned above was executed by the parties

to it, the deposit was never available to Kent Homes. The government itself could not determine who might be entitled to the deposit until the three-party agreement was finally executed and filed in March, 1958. It seems inconsistent now for the government to contend, in a later action that this deposit was made on December 18, 1957, and was then available to Kent Homes. All the evidence in the case indicates to the contrary. This Court is convinced that to now sustain the government's position in this matter with relation to the deposit made by it in the condemnation proceeding would result in a gross injustice.

■ The government presents the case to the Court by ignoring undisputed factual background of the condemnation case. This, the Court should not and will not do. If the facts which the government now chooses to ignore were not present, surely the law as stated in the well prepared briefs of the government would sustain its position, but the Court does not believe the Department of Justice should be permitted to take one position in a condemnation case when it seems appropriate for it to do so and then jump to an opposite position in a later tax proceeding when such position supports the government's claim. The only answer that the government makes to the facts developed in this case is to blandly announce that Exhibit 1 and Goodell's testimony are "no facts but merely speculations." (Defendant's Reply Brief, page 4) The government's statement that this evidence is "merely speculation" does not make it so and this Court does not believe the uncontroverted evidence in this case may be swept aside with such ease.

While the general rules indicate that a claim may be deemed accrued when (a) all the events have occurred which fix the amount of the claim and determine the question of liability, (b) the amount is readily ascertainable, (c) the liability is determined rather than contingent, it cannot be said that on or prior to January 31, 1958, in this case, any of the requirements had been met. The government undertakes to contend that the "three-party agreement" finally executed in March, 1958 refers back and was intended to be made effective as of January 1, 1958. The difficulty with this contention is simply that subsequent events which when considered, might satisfy the requirements of the "claim of right" theory, is not consistent with the rule requiring the proposition to be viewed in the light of the actual situation as it existed when the taxpayer was called upon to file his tax return for fiscal year ending January 31, 1958. Driscoll Bros. & Co. v. United States, D.C., 221 F.Supp. 603, 607. Furthermore, if the item is not collectible when the right to receive it arises, then there is nothing to accrue and it is excluded from income. See 33 Am.Jur.2d, § 2583, page 697.

It seems so clear as to be beyond dispute that in the condemnation case all the events had not occurred which fixed the right of Kent Homes to receive the deposit made by the government. Certainly the government in its confusion and uncertainty could not on or before January 31, 1958, determine with any reasonable accuracy, the amount thereof to which Kent Homes was entitled, if any. See Treasury Regulation, 26 C.F.R. § 1.446–1.

The government, in its brief, (Page 4, Reply Brief) undertakes to minimize the force of the Court's opinion in the case of Nitterhouse v. United States, 207 F.2d 618 (C.A.3d, 1953) but the reasoning found there is particularly applicable here. The statement of Judge Learned Hand found in Bedell v. Commissioner of Internal Revenue, 30 F.2d 622, 624 is quoted as follows:

"But if land or a chattel is sold, and title passes merely upon a promise to pay money at some future date, to speak of the promise as property exchanged for the title appears to us a strained use of language, when calculating profits under the income tax." We see no policy in favor of either taxpayer or government which would in-

duce us to construe the word "property" in section 111 in such a strained fashion. The simplest and most easily administered rule seems to us to be to make the transaction taxable when the taxpayer gets his money. This was the rule applied in Patrick McGuirl, Inc. v. Commissioner of Internal Revenue, 2 Cir., 1935, 74 F.2d 729 *even though the taxpayer was on the accrual method.* (Emphasis supplied)

And to further quote from *Nitterhouse:*

"Should that portion of the gain between the taxpayer's basis and this payment be apportioned to the year of the deposit? Money which has been set apart for a taxpayer and upon which he can draw is subject to tax as of that year. The fact that the taxpayer did not ask for the money thus held in the registry of the court should not be conclusive. However, we do not think that this deposit was available to the taxpayer at his will only. To withdraw it would have required a court order. And to get that order the petitioner would have to show that he had a clear title to the land free from tax and judgment liens and so on. It is not enough that the taxpayer might have got the money in 1944 had he applied for it and made the requisite showing. He did not apply for it and no requisite showing by him was made. Therefore, he was not in a position to show that he was unqualifiedly entitled to the money."

▮▮▮ In *Nitterhouse* the taxpayer was trying to show that he was entitled to the money because it had been deposited in Court in the year 1944. The government was opposing this contention, which contention the Court sustained, because the taxpayer had not established that he was entitled to withdraw it. In the case now before the Court, the evidence shows and the Court finds that the government would not permit the taxpayer to withdraw the deposit from the Court before January 31, 1958, the end of taxpayer's fiscal year because it could not be then determined who was entitled to have and receive the money. Before an item of income may be accrued there must be a fixed, determined and enforceable right to receive a reasonably ascertainable amount. Breeze Corporation v. United States, 117 F.Supp. 404, 127 Ct.Cl. 261. The Court finds that the item accrued by the agent was not a fixed, determined or enforceable right to receive the amount so accrued.

The facts stipulated by the parties and the findings set forth in the memorandum, will constitute the facts herein.

The Court, considering the "Statement of Issues" contained in the pretrial order, concludes that:

1. The $83,000.00 was a realized gain to the taxpayer in March, 1958. This was the date on which taxpayer had the right and exercised the right to withdraw the deposit following the execution of the three-party agreement in March, 1958. The government would not permit it sooner. The three-party agreement did leave taxpayer contingently liable on the mortgage.

2. The effective date of the three-party agreement insofar as it bears on the question of accrual of the deposit was March, 1958. The assumption of the mortgage by the Army did not occur earlier than February, 1958, and the withdrawal of the deposit was contingent upon the execution of the agreement.

3. The $83,000.00 deposit did not accrue to the taxpayer until fiscal 1959 and is to be first applied against the basis of the condemned property.

4. The issue of timely assessment was not presented to the Court.

The Court concludes that the gain resulting to the plaintiff was never determined or available to it in fiscal 1958 and by reason of the facts found herein was properly taxable in fiscal 1959.

Judgment is entered for the plaintiff and against the defendant in the amount of $69,980.31 plus interest paid by taxpayer on June 12, 1962 in the amount of $17,495.08, such judgment to also include interest on such amount as authorized by law plus the costs of this action.