**Orlando David GESTUVO, Petitioner,**

v.

**DISTRICT DIRECTOR OF the UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**Civ. No. 70-2434.**

United States District Court,
C. D. California.

Dec. 23, 1971.

Earl R. Steen, of Kwan, Cohen & Quan, Inc., Los Angeles, Cal., for plaintiff.

Robert L. Meyer, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civil Division, Rex Heeseman, Asst. U. S. Atty., Los Angeles, Cal., for respondent.

## MEMORANDUM AND ORDER DENYING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AND ESTOPPING RESPONDENT

PREGERSON, District Judge.

This case is before the Court because the Immigration and Naturalization Service changed its mind: as a result, petitioner faces deportation. The Service originally concluded that petitioner's professional credentials made him eligible for permanent residence in the United States as an immigrant. Relying on that determination, petitioner remained in the United States and established a life for himself here. Eighteen months later, however, the Service decided that petitioner was not and never had been qualified for permanent residence status. Petitioner has brought suit for judicial review of the Service's second decision. The Court has jurisdiction of the matter by virtue of the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.

I

Orlando David Gestuvo is a citizen of the Philippines who seeks permanent residence status in the United States under the 1965 amendments to the Immigration and Nationality Act, 8 U.S.C. §§ 1101 et seq. On August 24, 1967, Gestuvo visited the United States Embassy in Manila and filed a petition for classification as a preference immigrant (Form I–140; Tr. 13), claiming that he was a qualified professional eligible for a preference under 8 U.S.C. § 1153(a) (3). He stated in his petition that he intended to reside in Brooklyn, New York; that his profession was "banking"; and that he

held the degree of Bachelor of Business Administration.

Under 8 U.S.C. § 1182(a) (14) an alien holding a preference classification granted pursuant to § 1153(a) (3) may not enter the United States unless the Department of Labor certifies, first, that there are not sufficient workers in the United States "able, willing, qualified, and available" for the type of work that the alien intends to perform and, second, that employment of the alien will not "adversely affect the wages and working conditions of the workers in the United States similarly employed." Therefore Gestuvo again visited the United States Embassy on July 8, 1968, and filed an application for labor certification (Form ES–575; Tr. 15). In this application Gestuvo spelled out his credentials in detail. He listed the elementary and high schools that he had attended and pointed out that he had received the degree of Bachelor of Business Administration from the University of the East, which is located in Manila, during 1964. He attached a photostatic copy of his degree and of his complete university transcript, in English, listing all courses taken and grades received. Gestuvo also included his employment history, beginning approximately with the time of his graduation from the university. From May 1964 until October 1966 he had worked as a "Storekeeper" for the Philippine Notions Company, a button manufacturer. He explained that in that capacity he had "Arrainged (sic) the importation and exportation documents." Thereafter, from October 1966 until December 1967, he had worked for the Bowlmore Bowling Lanes and Restaurant, a family-owned business. He described his position there as "Bookkeeper" and explained that his duties had consisted of "Bookkeeping and managing the business at the same time." Finally, from January 1968 until the time that he filed his application, Gestuvo had been employed as a records and filing clerk in the Accounting Division of the Office of the Treasurer of the Province of Bulacan.

With these details before them, two government agencies charged with administering the Act proceeded to evaluate Gestuvo's credentials. On October 28, 1968, the Department of Labor issued the labor certification required by § 1182(a) (14) (Tr. 15). Shortly thereafter, on November 19, the Service approved Gestuvo's petition for a preference classification (Tr. 25). Gestuvo, meanwhile, had left the Philippines on a trip to Europe. On November 12, 1968 —seven days before his petition was approved—he appeared at the United States Embassy in Madrid, Spain, and obtained a nonimmigrant visitor's visa. He entered the country at New York on November 27, 1968.

It is not clear from the record precisely when Gestuvo learned that the Service had approved his petition for a preference classification, but certainly it was after his arrival in the United States. The Service did not issue its approval until after Gestuvo had obtained his visitor's visa. Gestuvo, moreover, was not in the Philippines at the time that the petition was approved, but the Service mailed its notice of approval (Form I–171B) to him at his address in the Philippines (Tr. 25). Once he did learn of the approval, however, he applied to the Service for adjustment of his status to that of permanent residence pursuant to 8 U.S.C. § 1255(a). In addition, at some time that the record does not specify, Gestuvo left New York for Southern California, where he found a position with a firm that services electrical household appliances produced by major American manufacturers (Tr. 12).

No immediate decision could be reached, however, on Gestuvo's application for adjustment of status. Under 8 U.S.C. § 1152(a), the number of natives of any single foreign country who may, if they have not yet been admitted to the United States, obtain immigrant visas, or who may, if they have already legally entered the United States as nonimmigrants, obtain an adjustment of their status to that of permanent residence is limited to a total of 20,000 dur-

ing any one fiscal year. Therefore natives of those few countries from which there is a large exodus of immigrants to the United States experience long delays before they can either obtain immigrant visas or permanent residence status— *i. e.*, before immigrant visa numbers become available. The Philippines is one of these countries, and as a result, Gestuvo has run afoul of certain Regulations promulgated by the Service.

In 8 C.F.R. §§ 204.4(b) and 205.1(b) (1) the Service has provided that its approval of the credentials of an alien seeking an immigrant visa or permanent residence as a professional entitled to preference classification shall remain in effect for only one year past the date of the labor certification issued pursuant to § 1182(a) (14). If the alien has not in the meantime obtained the immigrant visa or permanent residence status that he seeks, the Service's approval shall expire. After this expiration the alien may, under 8 C.F.R. § 204.4(c), apply to the Service for revalidation of the Service's approval. If the alien's labor certification remains valid or is revalidated by the Department of Labor, the Service's approval of the alien's petition for a preference classification "may be revalidated for a period of 1 year * * *, provided the beneficiary [*i. e.*, the alien] has retained his status as established in the petition * * *."

Under the provisions of Regulations 204.4(b) and 205.1(b) (1) the Service's approval of Gestuvo's petition expired on October 29, 1969. The Service waited until March 6, 1970, before notifying Gestuvo of the expiration of the approval (Form I–71; Tr. 10). Gestuvo applied for revalidation of the approval on March 12, listing his profession as "accounting" (Tr. 11) and enclosing a letter from his employer (Tr. 9). His employer, Golden State Appliance Service and Parts, Inc., of Los Angeles, notified the Service that Gestuvo was employed as an "assistant supervisor of shipping" and that the employer considered him a "permanent employee" and was "well satisfied with his work."

The Service denied Gestuvo's request for revalidation of its approval.

The Service's District Director in Los Angeles mailed a copy of the Service's decision (Form I–292; Tr. 8) to Gestuvo at his old address in the Philippines on June 7, 1970. The decision explained, "Despite your academic qualification, you have failed to exhibit a bona fide intent to be occupied in a professional field commensurate thereto." Gestuvo appealed to the Regional Commissioner on June 23 (Tr. 7) and submitted a more detailed letter from his employer (Tr. 5). The employer wrote that Gestuvo "is a permanent employee and is working in many departments of our company, mainly accounting." The letter continued, "Since we are a small business but are growing, there is a need for personnel capable to handle more than one position."

The Regional Commissioner dismissed Gestuvo's appeal on July 30, stating,

"The appellant has a degree in Business Administration and claims his occupation is 'banking.' Banking, per se, is not an occupation, there being many positions in banking, some of which may be professional, but not all of them. The record will not support a finding that the appellant is eligible for the classification he seeks. Furthermore, the petition was not approvable in the first instance. Therefore, the appeal will be dismissed" (Tr. 2–3).

On October 28 Gestuvo instituted this action for judicial review of the Service's decision. The case was remanded to the Service for further administrative proceedings on March 17, 1971, and on May 17 the Regional Commissioner reaffirmed his previous decision. This suit for judicial review was reopened on August 2, and the respondent's motion for summary judgment, brought pursuant to Rule 56, F.R.Civ.P., is now before the Court.

## II

■ The Court of Appeals for the Ninth Circuit has consistently held that

a refusal by the Service to approve a petition for a preference classification may be reversed only if the Service either abused its discretion or applied an improper rule of law. Reyes v. Carter, 441 F.2d 734 (1971); Song Jook Suh v. Rosenberg, 437 F.2d 1098 (1971); Pizarro v. District Director, 415 F.2d 481 (1969); Dong Yup Lee v. INS, 407 F.2d 1110 (1969). *See also* Tang v. District Director, 298 F.Supp. 413, 418 (C.D.Cal. 1969), aff'd 433 F.2d 1311 (9th Cir. 1970). Gestuvo, however, is not in the position of someone who merely filed a petition with the Service only to have it rejected: the Service originally approved Gestuvo's petition and then, eighteen months later, refused to revalidate its approval after it had been automatically revoked pursuant to Regulation 205.1(b) (1). It is clear from the descriptions that appear in the record of the various jobs that Gestuvo has held that Gestuvo's duties in his present position with Golden State Appliance are comparable to the responsibilities that he held with his previous employers in the Philippines. Therefore a determination by the Service that Gestuvo was ineligible for a preference classification in June 1970 even though he was eligible for that classification in November 1968 would be so arbitrary as to constitute an abuse of discretion. In his decision of July 1970, however, the Service's Regional Commissioner contends that Gestuvo never was eligible for the preference classification—that Gestuvo's "petition was not approvable in the first instance" (Tr. 3). Assuming, without deciding, that a refusal to approve Gestuvo's petition in November 1968 would not have constituted an abuse of discretion, and considering the hardships imposed upon Gestuvo by the contradictory positions that the Service has assumed in this case, the Court concludes that the Service should be estopped from denying, at this late date, Gestuvo's eligibility for the preference classification that he seeks.

Traditionally, estoppels against the government have not been favored. The courts have imposed estoppels only in very limited situations. 31 C.J.S. Estoppel § 138, p. 675. There is no complete agreement on precisely when estoppel is appropriate, but many courts have distinguished between situations in which the government acts in a proprietary capacity and situations in which it acts in its sovereign capacity. Because the maxim that estoppels against the government are not favored is apparently an outgrowth of the doctrine of sovereign immunity, several courts have held that the government is subject to estoppel only when it acts in a capacity in which a private party could also act—*i. e.*, in a proprietary rather than in a sovereign capacity. *See, e. g.*, United States v. City and County of San Francisco, 112 F.Supp. 451, 454 (N.D.Cal.1953), aff'd 223 F.2d 737 (9th Cir. 1955), cert. den. 350 U.S. 903, 76 S.Ct. 181, 100 L.Ed. 793 (1955); United States v. County of Lawrence, 173 F.Supp. 307, 314 (W.D.Pa. 1959), rev'd on other grounds 280 F.2d 462 (3d Cir. 1960), aff'd 364 U.S. 628, 81 S.Ct. 357, 5 L.Ed.2d 363 (1961); *see also* 31 C.J.S. Estoppel § 138, pp. 676–677; K. Davis, Administrative Law Treatise § 17.01, p. 491 (1958). The case law has recognized an additional limitation on the availability of estoppel as a defense against the government: the government is not estopped by the *unauthorized act* of a government agent, even if the agent misled a private party who was relying on his knowledge. A person dealing with an agent of the government, in short, has been held to know the scope of that agent's authority. Wilber National Bank v. United States, 294 U.S. 120, 123–124, 55 S.Ct. 362, 364, 79 L.Ed. 798 (1934); United States ex rel. Lapides v. Watkins, 165 F.2d 1017, 1019 (2d Cir. 1948). Finally, there is also authority for the proposition that a government official may not be estopped from correcting a mistake of law. Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 183–184, 77 S.Ct. 707, 709–710, 1 L.Ed.2d 746 (1957); *cf.* Kennedy v. Mendoza-Martinez, 372 U.S.

144, 157, 83 S.Ct. 554, 561, 9 L.Ed.2d 644 (1963).

In recent years, however, the doctrine of sovereign immunity has begun to crumble, and so have the rules insulating the government from estoppel. As the government's activities have extended to more and more facets of our national life, restrictions on the availability of estoppel have begun to give way before the demand to hold the government to the same standards of rectitude and conscientiousness to which the government itself seeks to hold the private parties with whom it deals. Courts of appeals have declared that the Commissioner of Internal Revenue may be estopped (Walsonovich v. United States, 335 F.2d 96, 101 (3d Cir. 1964); Schuster v. Commissioner, 312 F.2d 311, 317 (9th Cir. 1962); Simmons v. United States, 308 F.2d 938, 945 (5th Cir. 1962)), and district courts have estopped the United States from advancing arguments contradictory to positions taken prior to the litigation under consideration (United States v. 687.30 Acres of Land, 319 F. Supp. 128 (D.Neb.1970) (argument inconsistent with assurances given opponent at commencement of litigation); Kent Homes, Inc. v. United States, 279 F.Supp. 650 (D.Kan.1967) (argument inconsistent with argument advanced in related piece of litigation); United States v. 35.00 Acres of Land, 214 F. Supp. 792 (W.D.Mo.1962) (argument in condemnation case inconsistent with representations made during negotiations about compensation for adjacent land)).

Recent discussions of the availability of estoppel by the Court of Appeals for the Ninth Circuit are in line with these developments. In United States v. Georgia-Pacific Co., 421 F.2d 92 (9th Cir. 1970), the government brought suit for specific performance of an agreement in which a private corporation had promised to convey title to certain timber lands to the Forest Service. The district court found that there had been a failure of consideration and held that the agreement was void and unenforceable. The Court of Appeals affirmed that decision on the grounds, *inter alia*, that the government was estopped from enforcing the agreement. The court held that the government was acting in a proprietary capacity, because it was suing to enforce a contract, and that the government official upon whose actions the defendant had relied had been authorized to do what the defendant thought he had done. This holding was in accord with traditional doctrine, but the court used broad language in reaching it. The court noted that the restricted availability of estoppel had been the subject of extensive criticism. 421 F.2d at 99, n. 13. It observed that the distinction between sovereign and proprietary capacities was "not often an easy or meaningful one to make." 421 F.2d at 100, n. 17. It explained that "it is hardly in the public's interest for the Government to deal dishonestly or in an unconscientious manner." 421 F.2d at 100. Finally, the court actually enunciated its conclusion in these words:

> "One commentator has summarized the law in this area by saying that, 'The claim of the government to an immunity from estoppel is in fact a claim to exemption from the requirements of morals and justice.' [Berger, Estoppel Against the Government, 21 U.Chi.L.Rev. 680, 707 (1954).] We agree, and we find that the dictates of both morals and justice indicate that the Government is not entitled to immunity from equitable estoppel in this case." 421 F.2d at 103.

In Brandt v. Hickel, 427 F.2d 53 (9th Cir. 1970), two individuals brought suit under the Administrative Procedure Act for review of a decision by the Secretary of the Interior rejecting a non-competitive oil and gas lease offer that the plaintiffs had submitted to a local office of the Bureau of Land Management. The district court affirmed the Secretary's decision, but the Court of Appeals reversed, holding, *inter alia*, that the Secretary was estopped by misleading assurances that the local office had made to the plaintiffs. The court reasoned that

"some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement. * * * The Secretary was understandably concerned that the estoppel doctrine can have a deleterious effect on administrative regulation. However, administrative regulation must sometimes yield to basic notions of fairness." 427 F.2d at 56–57.

The court concluded,

"To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government.

"We would have a much different case if the booby trap unwittingly set for Mrs. Brandt and Mrs. Shell had somehow hurt the government. Bad advice cannot ordinarily justify giving away to individuals valuable government assets. This is no such case." 427 F.2d at 57.

The court reached this conclusion despite the fact that the local office had exceeded the scope of its authority in making the assurances to the plaintiffs. In addition, the court made no effort to differentiate between the government's sovereign and proprietary capacities. In *Georgia-Pacific*, on the other hand, the Court of Appeals had determined that the government was acting in a proprietary rather than sovereign capacity by distinguishing between suing to enforce a contract to convey land and actually administering the public lands, implying that while the former activity was proprietary, the latter was sovereign. 421 F.2d at 101. This latter activity was the very one involved in *Brandt*. Therefore *Brandt* seems to stand for the proposition that estoppel is available as a defense against the government even if the government is acting in a capacity that has traditionally been described as sovereign and even if the official whose actions form the basis of the estoppel exceeded his authority. The

court's opinion appears to enunciate a test that hinges on only two considerations: estoppel is available if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel. *See also* United States v. Lazy F C Ranch, 324 F.Supp. 698 (D.Idaho 1971), a tax case in which a district court, relying on *Georgia-Pacific* and *Brandt*, held the government estopped despite the fact that the action on which the taxpayer had relied had been undertaken without authority.

In light of the traditional limitations on the availability of estoppel as a defense against the government, the courts have heretofore refrained from explicitly deciding whether the government may be estopped in matters arising under the immigration and nationality laws. *See, e. g.,* Montana v. Kennedy, 366 U.S. 308, 315, 81 S.Ct. 1336, 1341, 6 L.Ed.2d 313 (1961); Moser v. United States, 341 U.S. 41, 47, 71 S.Ct. 553, 556, 95 L.Ed. 729 (1951); Peignand v. INS, 440 F.2d 757, 761 (1st Cir. 1971); Talanoa v. INS, 397 F.2d 196, 201, n. 6 (9th Cir. 1968); Tang v. District Director, *supra*, 298 F.Supp. at 420; *see also* Manguera v. INS, 390 F.2d 358, 360 (9th Cir. 1968); Hamadeh v. INS, 343 F.2d 530, 532–533 (7th Cir. 1965), cert. den. 382 U.S. 838, 86 S.Ct. 85, 15 L.Ed.2d 80 (1965); Kalatjis v. Rosenberg, 305 F.2d 249, 253 (9th Cir. 1962); Wong Kwok Sui v. Boyd, 285 F.2d 572, 574–575 (9th Cir. 1960); United States ex rel. Lapides v. Watkins, *supra*, 165 F.2d at 1019. Despite this reluctance to invoke estoppel, courts have often granted relief, where justice so demanded, to litigants who appeared ineligible, under a literal reading of the technicalities of the immigration and nationality laws, for the status that they sought.

Several courts have granted relief to litigants who attempted with due diligence to meet statutory deadlines, but failed to meet them because of delay by consular or immigration officials. Lee Wing Hong v. Dulles, 214 F.2d 753 (7th

Cir. 1954); Application of Martini, 184 F.Supp. 395 (S.D.N.Y.1960); In re Petition of Vacontios, 155 F.Supp. 427 (S.D.N.Y.1957); Lee Hong v. Acheson, 110 F.Supp. 60 (N.D.Cal.1953); Lee Bang Hong v. Acheson, 110 F.Supp. 48 (D.Haw.1951). Said the court in *Vacontios*, "A statute should not be interpreted in a way that would produce an unjust, unreasonable, or absurd result." 155 F.Supp. at 430.

Two cases have held that individuals who waived important rights because of misleading information given by government officials were not barred from citizenship, because their waiver had not been intelligent and therefore had not been valid. Moser v. United States, *supra;* Gay v. Brownell, 120 F.Supp. 319 (D.P.R.1954). Although the courts in *Moser* and *Gay* deliberately avoided the language of estoppel, a leading commentator has written, simply, that the two decisions "held the government estopped." K. Davis, *supra,* § 17.03, p. 504.

In Podea v. Acheson, 179 F.2d 306 (2d Cir. 1950), the court held that a native of Ohio who had been conscripted into the Roumanian army after American consular officials mistakenly informed him that he had lost his United States citizenship had not expatriated himself:

> "It seems most technical to hold that the plaintiff did not act under duress. In our opinion he never voluntarily expatriated himself by taking an oath of allegiance to Roumania or by service in the Roumanian army. Both steps were required by the situation in which he found himself, were primarily caused by the erroneous advice of the State Department and were farthest from his real purpose." 179 F.2d at 309.

The court spoke of duress rather than estoppel in *Podea*, but the Supreme Court has read the opinion to hold that the government was estopped. Montana v. Kennedy, *supra,* 366 U.S. at 315, 81 S. Ct. at 1341, 6 L.Ed.2d 313, text and n. 11.

■ Although the major issues raised in these cases concerned citizenship rather than immigration, the opinions do carry weight as precedent in suits brought to review immigration decisions. Citizenship and immigration are closely related subjects, and *Moser, Podea, Vacontios,* and the other cases demonstrate that this area of the law is not beyond considerations of "morals and justice." The Court of Appeals for the Ninth Circuit recognized the close connection between citizenship law and immigration law in Tejeda v. INS, 346 F.2d 389 (9th Cir. 1965), an immigration case that the court decided by relying heavily on *Moser*, a citizenship case.

The Court of Appeals held in *Tejeda* that a Philippine citizen would be eligible for discretionary relief from an order of deportation if it appeared, upon remand, that he had failed to take advantage of a special statutory provision because of misleading information given him by a United States Consul. The court stated,

> "We hold that petitioner would be eligible for relief * * * if it is shown that he was actually and reasonably misled by the affirmative acts and misstatements of the American Consul. To hold to the contrary if this is in fact what transpired, and deny any form of relief from the order of deportation, would result in the punishment of a poorly-educated alien for his reliance on the advice of a presumptively well-informed official of the United States Government. This we would deem improper." 346 F.2d at 393.

The court continued,

> "Certainly, deportation of petitioner would be manifestly unjust where he possessed the statutory authority to reenter the United States in 1947 or 1948, if in fact he did not pursue that right because of a justifiable reliance upon a misstatement of a United States Government official. Congress unequivocally permitted certain Fili-

pinos, of whom Tejeda was one, nonquota immigrant status from July 4, 1946 through July 3, 1951. If the properly developed factual findings reveal that petitioner made a bona fide effort to reenter in 1947 or 1948 and failed to obtain reentry due to the misadvice of the American Consul, the respondents should be *precluded* from denying petitioner what was rightly his—reentry as a nonquota immigrant in 1947 or 1948 * * *." 346 F.2d at 394. (Emphasis added.)

Once again the court refused to mention estoppel, but its reasoning in the quoted passages and its use of the word "precluded" are practically indistinguishable from estoppel.

 It is no easy task for a nation of 200,000,000 people to govern itself in a manner consistent with democratic principles. Congress has attempted to do so by establishing large, bureaucratic agencies to administer national policies. Efficient administration of these policies requires that decisions taken by agency officials after careful deliberation be subject only to limited judicial review. *See* 5 U.S.C. § 706. Nevertheless, "the requirements of morals and justice" demand that our administrative agencies be accountable for their mistakes. Detrimental reliance on their misrepresentations or mere unconscientiousness should create an estoppel, at least in cases where no serious damage to national policy would result. As the Court of Appeals recognized in *Georgia-Pacific,* "it is hardly in the public's interest for the government to deal dishonestly or in an unconscientious manner." 421 F.2d at 100. These principles, moreover, apply as much to the Immigration and Naturalization Service as to any other of our administrative agencies, and it should

not be immune from estoppel. The contrary conclusion would sacrifice "to form too much of the American spirit of fair play in both our judicial and administrative processes." Jay v. Boyd, 351 U.S. 345, 361, 76 S.Ct. 919, 929, 100 L.Ed. 1242 (1956) (Warren, C. J., dissenting). It would also contradict *Georgia-Pacific, Brandt,* and the above-cited immigration and citizenship cases.

### III

 In California State Board of Equalization v. Coast Radio Products, 228 F.2d 520 (9th Cir. 1955), the Court of Appeals for the Ninth Circuit adopted California's definition of estoppel:

> "Four elements are necessary: '(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.'" 228 F.2d at 525.

The Court of Appeals employed the same definition in Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104 (9th Cir. 1960), cert. den. 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960), and in United States v. Georgia-Pacific Co., *supra,* 421 F.2d at 96.

Gestuvo's predicament fits this definition. *First,* the Service knew the facts. In the official forms that Gestuvo filed with the Service (Forms I–140 and ES–575; Tr. 13, 15) he listed in detail his academic achievements and his employment experience. Therefore when the Service approved Gestuvo's petition on November 19, 1968, it acted with Gestuvo's credentials before it.[1] In addi-

---

1. In his petition for a preference classification (Form I–140; Tr. 13), which he filed on August 24, 1967, Gestuvo listed his profession as "banking." That does not appear to have been an accurate description of Gestuvo's background, although it may have accurately reflected his hopes. Nevertheless, the Court believes that the statement should be re-

garded merely as puffing. In addition, when the Service approved Gestuvo's petition, it had before it not only his Form I–140, but also his application for labor certification (Form ES–575; Tr. 15), which he had filed on July 8, 1968. The Form ES–575 contained detailed information about Gestuvo's training and experience.

tion, it must be presumed that the Service understood the applicable statutes and regulations: it is the duty of the Service to administer the immigration laws.

*Second,* Gestuvo had a right to believe that the Service intended its conduct to be acted upon. After Gestuvo had submitted his credentials, the Service approved his petition for a preference classification. In approving the petition the Service acted as that agency of the United States government charged with administering the immigration laws. Gestuvo was entitled to believe that the Service's decision was an authoritative determination of his eligibility that was based upon his credentials as they existed at that time.

*Third,* Gestuvo could not know all the true facts. The Service did attempt to inform him that its approval would remain in effect for only one year, although it is not clear that he actually received that notice (Form I–171B; Tr. 25). Gestuvo could not know, however, that the Service's original approval of his petition was erroneous, as the Service contends in the Regional Commissioner's decision of July 30, 1970 (Tr. 3). All Gestuvo could know was that he had submitted his credentials and that the Service had approved them.

*Fourth,* Gestuvo relied on the Service's original decision to his detriment. When Gestuvo learned that his petition had been approved, he decided to remain in the United States rather than return to the Philippines. He sought and found employment very similar to that in which he had engaged in the Philippines, apparently believing that such work met the requirements of the United States immigration laws. Perhaps he would not have been able to find more suitable employment in the United States had he tried to do so. Nevertheless, had the Service rejected his petition for a preference classification in November 1968, he would have returned to the Philippines soon thereafter. Upon his return to his homeland he could have searched for a position that made more effective use of his academic background, in preparation for filing a new petition for a preference classification. His chances for finding such a position would certainly have been better in the Philippines than in the United States: he might even have earned a promotion to a more suitable position had he returned to his job with the Provincial Treasurer's Office. Instead of pursuing these alternatives, however, Gestuvo remained in the United States and settled in Southern California. It was only after he had devoted eighteen months to building a new life for himself that the Service determined that it had made a mistake. Gestuvo's reliance on the Service's 1968 decision prevented him from meeting the requirements set forth in the 1970 decision.

Nothing in this case, moreover, indicates that estoppel of the Service would significantly disrupt the administration of any national policy. *See* Brandt v. Hickel, *supra,* 427 F.2d at 57. Congress authorized the immigration to the United States of aliens who meet prescribed criteria. The statutory scheme that Congress established in the 1965 amendments, Pub.L. 89–236, is a rigorous one, but it was created largely for humanitarian reasons: it was designed to replace the old national origin quota system that had been so unfair to natives of non-European countries such as the Philippines. S.Rep.No.748, 89th Cong., 1st Sess., 1965 U.S.Code Cong. & Adm. News 3328 (1965). Gestuvo is a man with a college degree and with experience in managing a business, in bookkeeping, and in accounting. That these skills are valuable cannot be denied. Any disruption of the nation's immigration policies that might result from the admission of this single individual into the country would, in short, be miniscule in comparison to the hardship to which he would be subjected by a failure to estop the Service.

The national interest lies in a conscientious review by the Service of the applications that are submitted to it at the time of their submission: it does

not lie in sacrificing a man's efforts and hopes to a mechanical and inhuman application of administrative regulations. People like Gestuvo rely on the Service to reach accurate rulings on which they can base their plans. It was the Service that led Gestuvo down the path towards permanent residence. Having done so, it should not have shoved him into a ditch along the way. Its action was improper.